# THE MAYOR AND CITY COUNCIL OF BALTIMORE AND GODDARD J. MATTINGLY

*vs.*

# LUIGI DE PALMA, by His Father and Next Friend, Angelo De Palma.

*Personal Injuries—Child on Lumber Pier—Implied Invitation.*

In an action for injuries to a child, caused by the fall of a pile of lumber on a city pier, on which he was playing, *held* that the pier being devoted by the city, which owned it, exclusively to the use of lumber and other merchants, as a place to unload and store lumber and to unload cargoes of other goods, and the child having consequently no right to be on the pier, there could be no recovery. pp. 184, 185

The mere fact that a city owned the pier did not make the pier a public highway, especially where it was not open for or devoted by the city to the use of the public generally as a highway, and the general public did not in fact use it as such. p. 185

The uncontradicted evidence showing that the pier was a lumber pier, and was devoted by the city to the use of lumber and other merchants as a place to unload and store lumber, and to unload other cargoes, and that the chief harbor master of the city had issued instructions prohibiting boys from going on the pier, and that boys were repeatedly driven off and arrested for violating such regulation, the fact that persons other than merchants and those having business with them visited the pier, from curiosity or other motives, with the knowledge of the city officials, does not justify a finding of an implied invitation to the public or to the plaintiff, who was injured while playing there, to go on the pier. pp. 186-190

The doctrine of attractive nuisances *held* not applicable to the case of a child injured, while playing on a lumber pier, by the fall of a pile of lumber. p. 191

*Decided December 1st, 1920.*

Appeal from the Superior Court of Baltimore City (SOPER, C. J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*A. Walter Kraus, Assistant City Solicitor,* with whom were *Roland R. Marchant, City Solicitor,* and *Edward F. Johnson, Assistant City Solicitor,* on the brief, for the appellant, Mayor and City Council of Baltimore.

*Charles W. Paine,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant, Goddard J. Mattingly.

*William Curran,* with whom was *Vincent L. Palmisano* on the brief, for the appellee.

THOMAS, J., delivered the opinion of the court.

This appeal is from a judgment recovered against the Mayor and City Council of Baltimore and Goddard J. Mattingly·for injuries alleged to have been caused by the negligent and careless manner in which lumber was piled or placed by Mattingly on one of the piers owned by the Mayor and City Council of Baltimore.

The pier in question is Pier No. 6, and is known as a lumber pier. It is located on Pratt Street, which runs east and west, that is to say, it extends from Pratt Street in a southerly direction about fifteen hundred feet into the river or harbor, and is from seventy-five to one hundred feet wide. It is an uncovered concrete pile pier, designed and constructed for the use of merchants who need the use of a pier in their business, and in June, 1918, and for a number of years prior thereto, was devoted by the city principally or exclusively to the use of lumber merchants as a place to unload and store lumber. The surface of the pier was paved and was divided into sections, and the lumber was so placed or piled in these

sections as to leave a driveway of irregular width in the center of the pier. This driveway extended from the Pratt Street end to the southern or outer end of the pier, and was wide enough for two vehicles to pass when employed in hauling the lumber. The lumber was stored on both sides of the driveway in piles from seven to ten feet high. These piles extended from the driveway to the edge of the pier, and the only way to get out on the pier was along this driveway. There were two shacks at the Pratt Street end, one used by the clerks of the different lumber merchants and the other by Mr. Mattingly as an office, and there was a sign at the entrance of the pier, located in the center of the driveway, marked "Pier 6, Pratt Street." Space on the pier was leased to lumber merchants as a place to store their lumber, and was paid for by them according to the space occupied.

The pier was under the supervision and control of the chief harbor master of the city, whose duties were to enforce the harbor laws and regulations of the city, and to supervise the collection of charges for the use of municipal piers. According to his testimony, and the instructions issued by him, only those persons who leased space on Pier 6, and those who "had business relations with them," were allowed to go on that pier, and during the recent war, under the "Government regulations," which were enforced as far as possible until after the signing of the Armistice, no one was allowed to go on the pier unless he had a pass. Special instructions had been given to the assistant harbor master having charge of Pier 6 to prohibit boys from going on the pier, and the police force of the city had been requested to assist in the enforcement of this regulation.

The plaintiff at the time of the accident was about ten years of age, and had been told by his mother never to go on Pier 6, that it was dangerous and that he might fall in the water or "some lumber might fall" on him. About half past seven o'clock in the evening of June 3rd, 1918, he was asked by Miss Denneburg, a young girl about twenty years of age,

if he knew where her brother David, a playmate of the plaintiff, was, and he took her out on the pier, where he thought he would find David and a number of other boys playing. According to his testimony, after he found David and the other boys on the pier between the piles of lumber, and pointed them out to David's sister, he started to go or run home and, as he was passing between the piles of lumber, several boards fell on him and he sustained, according to the testimony of the physician who attended him, a fracture of the left thigh. He had seen boys on one occasion climb on the piles of lumber, but did not see them on top of the pile that night, and did not know "whether they were up on the pile or not." The young girl who went on the pier with the plaintiff testified that they were on the pier at least ten minutes before the accident happened, that the plaintiff did not climb up on the pile of lumber, that she did not see the boards fall and could not tell whether they fell from the top or side of the pile, that she was between the piles of lumber where she had gone to see if the boys were there, and that after she heard the plaintiff scream she found him under some boards.

Vincent Yamonico, a witness for the plaintiff, testified that he had been on Pier 6, had seen other persons go out on the pier, and had seen boys fishing and swimming on the pier; that he went on the pier to see the boats; that he had seen lumber boats and launches tied up at the pier, but did not see any there on the day of the accident, and that the only way you could get to these boats was to go along the central driveway and then between the piles of lumber to the side of the pier where the boats were.

Vincent L. Palmisano, another witness for the plaintiff, who was also one of the plaintiff's counsel, testified that he had had occasion to go on Pier 6 "and to go on submarines that had landed on the west side of it," that a great number of persons went to see the submarines while they were at the pier, that both sides of the pier were used for launches and boats, and that people landing from these boats would have

to go through the lumber piles on the pier, that he went on the pier "out of idle curiosity" to see the submarines, and was not invited to do so by any city official. On cross-examination he said that the submarine Deutschland was at Pier 5, which was leased by the Government, and that he did not know that any submarines came to Baltimore before the Armistice was signed in November, 1918.

In addition to the testimony of the chief harbor master to which we have already referred, he futher testified that lumber vessels were the only vessels that docked at Pier 6, and that passenger launches were not permitted at that pier, that when you look at Pier 6 from Pratt Street you see nothing but wood, and that "there was no sidewalk down there." John S. Mister, an officer of the police force of the city, testified that for several years, including June, 1918, he was in charge of a post comprising Piers 4, 5 and 6; that Pier 6 was used for the storage of lumber; that he was on the pier from four to seven times a day, and that during the summer season when the children were out of school he was there more frequently than at other times because he had trouble in keeping them off the pier; that they would sometimes go there to swim off the end of the pier; that he had arrested from forty to fifty; that he had instructions from the marshal and harbor master "to keep people off the pier that did not belong there," and that whenever he saw children on the pier he drove them off; that lumber boats landed at Pier 6, but that pleasure boats landed at Pier 4 and at the city pier at the foot of Calvert Street. The testimony of Mr. Mattingly and his manager, Albert H. Lee, as to the use of Pier 6, the class of persons who visited the pier, and the enforcement of the rule prohibiting children from going on the pier, was to the same effect as the testimony of the harbor master and the police officer.

The plaintiff called in rebuttal Mr. James F. Thrift, who was comptroller of the city at the time of the accident, and when he was asked as to "his determination of the use to

which any pier could be put" he replied, "not exactly because some piers were specifically dedicated by ordinance to the storage of lumber," and that Pier 6 "was for the purpose of the storage of lumber, * * * and was known as a lumber pier." When asked, "Was not Pier 6 confined in its use exclusively to the lumber trade and to persons having business in connection with the lumber trade?" He replied, "I think that is true; I do not recall any other use to which Pier 6 was put." When asked, "Do you know whether that was the only purpose that carried people to this pier?" He said, "I can only answer that by saying that I do not know of any reason anybody should not have gone on the pier so long as he was not committing any nuisance or doing anything unlawful." On cross-examination, he said "that Pier 6 was known as a lumber pier but if boats came in there with commodities for merchants in the city they could unload over that pier upon payment of a wharfage or dockage charge; that it was not a playhouse; that it was not like the Broadway Recreation Pier; that it was a business place."

In the case of *Maenner* v. *Carroll*, 46 Md. 212, one of the counts in the declaration alleged that the defendants were the owners of an open and uninclosed lot within the limits of the city, and that persons were in the habit of passing over the same; that the defendants cut on said lot, "in a dangerous and exposed portion thereof," a deep excavation, and left the same in a dangerous condition, and liable to injure persons in passing over the lot, and that the plaintiff while passing over the lot at night fell in said excavation and was injured. In holding this count bad on demurrer, JUDGE ALVEY, speaking for the court, said: "To constitute a good cause of action, in a case of this nature, there should be stated a right on the part of the plaintiff, a duty on the part of the defendant in respect to that right, and a breach of that duty by the defendant, whereby the plaintiff had suffered injury. Here there is nothing of the sort shown. All the facts alleged in this count may be true and yet the plaintiff would have no

right of action against the defendants. The fact that persons were in the habit of passing over the lot, gives the plaintiff no right to do so; and unless there was such a right there was no breach of duty on the part of the defendants in cutting and leaving open the excavation." Applying these principles to the facts in the case at bar, it would seem clear that the plaintiff has failed to establish any liability on the part of the city or Mattingly for the injuries he sustained.

The appellee contends that Pier 6 was one of the public highways of the city, and that therefore the city was under obligation to use reasonable care to keep it in a "condition to be safely traveled." Assuming that a *public* wharf, so far as liability for negligence is concerned, should be regarded as a public highway, there is no evidence in this case to show that Pier 6 was a public highway. The mere fact that the city owned the pier would not make it a public highway, especially where, as in this case, it was not open for, or devoted by the city to, the use of the public generally as a highway, and the general public did not in fact use it as such. In 15 *R. C. L.,* p. 14, it is said: "A highway is a way open for the public at large without distinction, discrimination or restriction, except such as are incident to regulations calculated to secure to the general public the largest practical benefit therefrom and enjoyment thereof," and it is stated on page 15 of the same volume that "the test is whether it is an open public way or one for the exclusive benefit of an individual or certain individuals. It is the right of travel by all the world, * * * which constitutes a way a public highway. * * * If it is open to all who desire to use it, it is a public highway." We do not understand the appellee as contending that the city had no right or authority to devote Pier 6 to the exclusive use of lumber merchants, and other merchants of the city, as a place to unload and store their lumber or to unload a cargo of their goods, and to restrict its use to such merchants and those having business dealings with them. This right of the city being conceded, as it must

be, it follows that under the principle announced in *Maenner v. Carroll, supra; Benson* v. *Baltimore Traction Co.,* 77 Md. 535; *Mergenthaler* v. *Kirby,* 79 Md. 182, and *Stansfield* v. *C. & P. Tel. Co.,* 123 Md. 120, and many other cases to the same effect, the duty of the defendants, and their liability for negligence, was limited to those rightfully on the pier. Cases like *Havre de Grace* v. *Fletcher,* 112 Md. 562, and *Weber* v. *Harrisburg,* 216 Pa. 117, relied on by the appellee, are in entire accord with this view. In the *Havre de Grace case* the infant plaintiff was injured while on one of the public streets of the city by the falling of a beer keg which the city had negligently permitted to be so piled along the street as to be dangerous to persons passing along that highway, and in the *Harrisburg case* the plaintiff was injured by an obstruction across a public path in one of the parks of the city. In each of these cases the plaintiff was on a public highway of the city, where he had a right to be, the duty of the city was to keep the public street or highway in a safe condition for the use of the public, and the negligence relied on was its failure to discharge that duty. In the case at bar the plaintiff was not injured while on one of the public highways of the city, or by reason of the unsafe condition of a public highway, and his right to recover must depend upon whether he had a right to be where he was at the time he sustained the injury of which he complains.

It is urged on behalf of the appellee that "the city is liable as a private proprietor of Pier 6 to the plaintiff because of the implied invitation to the plaintiff arising from its acquiescence in the use made of the pier by the public," and his counsel rely largely upon the case of *Burke* v. *Md., D. & Va. R. Co.,* 134 Md. 156. A glance at that case will show, however, that it bears no analogy to the case we are now considering. There the defendant was a common carrier of passengers, and as a part of its system operated a line of steamers from Baltimore to Love Point, in Queen Anne's County, Maryland, where it owned or operated a pier or wharf at

which passengers and freight were landed and transferred to cars run out on the pier to receive them. The defendant advertised fishing and crabbing as one of the attractions of Love Point, and persons who went there on the steamers to fish and crab were accustomed to fish and crab on the pier. The defendant kept a store and a barber shop and also furnished meals on its boats and, while the steamers were at the pier, those who went to Love Point on the steamers to fish and crab, and other persons staying at Love Point, "generally went to the boat to buy things, to get shaved or to get a meal." After referring to these facts, and discussing the doctrine of implied invitation, this Court said: "Even if we assume that there is not sufficient evidence in this case of any *benefit* accruing to the defendant to warrant a finding by the jury that excursionists and persons visiting Love Point were invited to fish and crab on the pier, we think there was ample evidence to justify the finding of an implied invitation from the *acquiescence* of the defendant in such use of the pier. Moreover, at the time of the accident, the plaintiff was not fishing or crabbing but, according to his testimony, was on his way to the store on the defendant's boat, to purchase some of the things it offered for sale, and stopped at the point where he was standing at the time of the accident to wait until the passengers and freight were discharged. He could not have been regarded as a trespasser or mere licensee in the store of the defendant, and there would be no greater reason for holding him to be a trespasser or licensee in going on the pier to visit the store." In the case of *Benson v. Baltimore Traction Co., supra,* and the case of *Stansfield* v. *C. & P. Tel. Co., supra,* this Court quotes with approval the statement of the court in *Hargreaves* v. *Deacon,* 25 Mich. 5: "We have found no support for any rule which would protect those who go where they are not invited, *but merely with express or tacit permission, from curiosity or motives of private convenience,* in no way connected with business or other relations with the occupant." Allowing full force

and credit to the evidence produced by the plaintiff, and as-
suming that persons other than the merchants using Pier 6,
and those having business with them, from curiosity or other
motives, visited the pier with the knowledge of the officials
of the city, this evidence is not sufficient to justify a finding
of an implied invitation to the public or to the plaintiff to
go on the pier, for the uncontradicted evidence also shows
that Pier 6 was a lumber pier, and was devoted by the city
to the use of lumber merchants, and other merchants of the
city, as a place to unload and store their lumber, and to un-
load cargoes of their "commodities," and that, under the in-
structions issued by the chief harbor master of the city, boys
were expressly prohibited from going on the pier, and were
repeatedly driven off and arrested for violating such regula-
tion.   In the case of *Birch* v. *City of New York*, 190 N. Y.
397, the city had purchased the pier about eight years before
the accident, but had never devoted it to public use.   After
the city acquired title it was used as it had been before.
Various persons went there for bathing and fishing, several
contractors, under special permits from the port authorities,
used it for unloading cargoes of brick and building material,
and garbage scows had loaded and unloaded there on various
occasions.   A boy about seventeen years old went with a
pleasure party for a sail on a tugboat.   When they returned
it was dark, and the water was so rough, the captain of the
tug thought it inadvisable to permit his passengers to "dis-
embark into the rowboats," and decided to run the tug to the
pier, where he had tied up his tug on previous occasions.
After landing on the pier the boy fell through a large hole
in the floor of the pier and was drowned.   In disposing of
the suit brought by his administrator, the Court of Appeals
of New York said: "This (the pier) was private property,
although owned by the city and held for a public purpose,
and that private character continued until it was actually
devoted to the public use for which it was purchased, unless
the city either invited or permitted a use of it that was pub-

lic in its nature. Swimming and fishing are not, strictly
speaking, pier uses at all, and certainly not uses which could
convert a private pier into a public one. Nor was the use
of the pier for unloading contractors' building materials,
under express permission of the port authorities, inconsistent
with its private character. Neither were the other occasional
and incidental uses to which, according to the evidence, it
may have been devoted, such as to support the conclusion that
it was in any sense a place to which the public had been im-
pliedly or expressly invited. We think, therefore, that the
case falls within the rule succinctly expressed in *Thompson
on Negligence* (Vol. 1, Par. 945) as follows: 'The owner or
occupier of real property is under no obligation to make it
safe, or to keep it in any particular condition for the benefit
of trespassers, intruders, mere volunteers, or bare licensees,
coming upon it without his invitation, express or implied.' "
In the case of *Powers v. Owego Bridge Co.,* 97 N. Y. App.
Div. 477, 89 N. Y. Supp. 1030, the defendant, who had con-
tracted with the City of Rome to build a bridge where one of
the streets crossed the Mohawk River, rented a vacant lot ad-
joining the street on which to store lumber and other ma-
terials to be used in the construction. The lot had been used
as a dumping ground, and persons had been in the habit of
crossing over it. After the defendant took possession and
piled its lumber on the lot, children frequently played on the
lot, and had been repeatedly driven off by the employees of
the defendant. While the plaintiff, about six years old, was
playing with other children on or about the lumber piles, he
was injured by some of the lumber falling on him, and suit
was brought to recover for such injury on the ground that the
lumber was carelessly piled. In reversing the judgment of
the lower court, the Supreme Court said: "Defendant owed
no duty to the plaintiff, beyond that it owed to other strangers
* * * It cannot be said that a pile of lumber away from a
public place—that is, a place where the public has a right to
be—is dangerous to the public; and whoever goes upon the

premises and interferes with it cannot complain if injury results. This case is quite distinguishable from those where lumber or building material has been insecurely piled upon the street, so as to menace the safety of those passing, and from those wherein dangerous structures have been maintained upon premises to which the public have been invited." The case of *Vanderbeck et al.* v. *Hendry,* 34 N. J. L. 467, is in many respects like the case at bar. "The defendants were lumber merchants in Jersey City, and had a lumber yard on Wayne Street, built on piles, and through it from that street were three passages or gangways, sixteen feet wide, running northwardly a distance of about eighty feet, to another gangway of about the same width, running east and west along the water the length of the yard. * * * On each side of the three gangways the lumber was usually piled, and the ways were used for loading and unloading the material." The passages were occasionally used by persons to get from Wayne to Greene Street, and children went to the yard to pick up chips and wood, but orders were given by the defendants to drive the children off. The plaintiff, who was about ten years old, went with his sister, who was about fourteen years old, to another place to get wood and, failing to secure some, then went to the defendants' yard to see what kind of place it was. While looking through the timbers at some boys getting wood out of the water under the dock, two piles of lumber fell, killing the sister and severely injuring the plaintiff. The plaintiff claimed, as is claimed in this case, that the lumber fell because it was not properly secured by binders, but the court said: "In carefully examining the case the following is the necessary result of the evidence: the passageways were in no sense intended for the use of the public, except as they might have occasion to go there for the purpose of business; the public, otherwise than to that extent, were not either expressly or impliedly invited or allowed to pass through them. The occasional passing through by persons to reach Greene Street was not encouraged by the defendants,

or in anywise acquiesced in, otherwise than may be implied from not expressly forbidding it. The presence of children in the passage-ways was without any consent or even acquiescence of the defendants, for it cannot be disputed that generally they were driven out of the yard. Under these circumstances, the defendants ought not to be held responsible to the plaintiff for mere neglect in the mode of piling the lumber. The plaintiff was a mere volunteer, and not there within the scope of the purpose of the way, or by any act of the defendants induced to come into it. The exposure of such gangways, clearly intended for business uses alone, although in a populous locality, where children might be tempted from curiosity or idle purpose to go, is not sufficient, under the authority of *Corby* v. *Hill* (4 C. B. (N. S.) 556), or the cases analogous, to require the defendants to either fence their yard or pile their lumber with reference to the fact that children might be injured by mere neglect in its piling."

The doctrine of attractive nuisances is not applicable to the facts of this case (20 *R. C. L.* 79; *Grube* v. *Baltimore City,* 132 Md. 355), and upon the record before us there is no ground upon which the plaintiff can recover. The first prayers of the city and of the defendant Mattingly, directing a verdict in their favor, should therefore have been granted, and it is not necessary to consider the other questions presented by the record.

> *Judgment reversed, with costs, without a new trial.*