## SUSQUEHANNA POWER COMPANY ET AL. *v.* THOMAS N. JEFFRESS.

[No. 56, April Term, 1930.]

*Decided June 24th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Stevenson A. Williams,* with whom was *Fred R. Williams* on the brief, for the appellants.

*Robert H. Archer, Jr.,* with whom were *John Paul Jones* and *J. Glasgow Archer* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The middle of the waters of the Susquehanna River is the boundary line between Cecil County and Harford County, and one of the public highways of these two counties was united by a toll bridge spanning the river near Conowingo in Cecil County. This highway became one of the thoroughfares of the state, and as early as August 22nd, 1911, the State Roads Commission of Maryland acquired all the property and franchise rights of the corporation which had owned and maintained the toll bridge. Some years later the Susquehanna Power Company began the development of the water power of the Susquehanna for the generation and delivery of electricity. The project was based upon the construction of a high dam across the river, whose impounded water would create an extensive lake by submerging a large contiguous area, with its highways. The level of the lake was above the toll bridge mentioned, and the plan of the power company involved the destruction of the bridge and its approaches and the permanent flooding of a section of the highway at both entrances to the bridge. As a condition to the state's consent to this appropriation of public ways, certain obligations were imposed. Among them was to supply a passage of the river for public travel by the construction of a concrete highway which was to unite the original highway at points in Cecil and Harford Counties to the east and west of the river banks, and have for its midway section a roadway constructed upon the breast of the dam. Acts of 1927, ch. 318, p. 558; *Huffman v. State Roads Commn.,* 152 Md. 566. The power company fulfilled its undertakings after several years of vast labor, and, having provided the new highway and put the state in its possession, was empowered to destroy and cover with the rising waters of the lake the

old bridge and its approaching roadway. As a final step in these proceedings the state, on November 14th, 1927, by deed of record granted to the power company the bridge, its structure and approaches, and those parts of the highway leading to its ends as might be required for the ultimate spread of the lake, with the provision that the rights of the public in the highways affected should continue unimpaired to the edge of the waters of the lake. So those sections of the public road to the east and west of the shores of the resultant lake remained public ways. However, the filling of the lake was gradual and its limits were not found by the slowly rising water for some weeks. It was during this period that the plaintiff's alleged cause of action arose.

On November 15th, 1927, the new concrete highway, which formed a link passing across the top of the breast of the dam and uniting with the old highway in Cecil and Harford Counties, was opened for public travel as a state highway. Preparatory to this event, the State Roads Commission placed what are called bridge and road signs in both Cecil and Harford Counties. These black and white signs were five feet long by two and one-half feet wide; and the lettering of the words at the top: "Bridge & Road Notice" were 2.75 inches high while the body of the warning was in letters 1.3 inches high. The notice was over the name of the State Roads Commission, and declared that the Conowingo Bridge and its immediate approaches would be closed to the public after November 14th, 1927, and that thereafter the river crossing would be over the dam of the power company, and gave direction at what points the new way was to be taken. One of these notices was placed in Cecil County and one in Harford County, at the points where the new concrete link entered the old roadway, and a third was placed in Cecil County at a point on the old roadway where it was crossed by a highway from Rowlandsville that intersected the concrete link. The notice at the junction in Cecil County of the concrete road with the old highway was affixed to two upright posts and was conspicuously placed for obser-

vation by the traveler at the side of the road. From this point to the Conowingo Bridge is said to be four and one-half miles, although the legend "Stone Road ends 4" appears on a sign post on the opposite side of the road to the notice. The other notice was similarly located at the intersection with the highway from Rowlandsville, approximately midway between the first notice and the Conowingo Bridge. The plaintiff testified that on a trip to and from Washington in his automobile he had passed the points where these notices were located twice after they had been set up along the roadside, and had driven by them on the night of his plunge into the river, but he had not seen either of the notices. Aside from these two notices, there was no other warning to the traveling public, nor any other indication, that the bridge was no longer open to public travel until at a place in the old highway 720 feet from the eastern abutment of the bridge. At this point the State Roads Commission, several days after the erection of the notices, built across the entire width of the roadway a barricade of railroad ties, stone, and four ton trucks of earth. This obstruction was made five feet wide at its base and about four feet high. On its top and near its center a sign was placed bearing the words "Road' End," which were visible at night in the reflected light cast by the headlights of an approaching automobile. There is some uncertainty on the record as to when the road was thus made impassable, but there is no question that it was after the bridge and its approaches had been granted to the Susquehanna Power Company and had ceased to be a public thoroughfare. Furthermore, it is clear that the power company and its agent and co-defendant, the Stone & Webster Company, were then in full possession and exclusive control of, not only the bridge and its approaches, but also the contiguous area for as much as fourteen hundred feet to the east measured from the end of the bridge. This area was the ascertained bottom of the water to be impounded by the dam thrown across the river two miles down stream. In

fact, the scene described has been submerged under a great depth of water since the first part of 1928.

The Conowingo bridge was intact when the State Roads Commission thus made its eastern approach inaccessible to vehicular traffic. Its demolition began with the dynamiting of a steel span on November 23rd, 1927, the burning of wooden spans on November 25th, and the blowing up of six steel spans on the 28th, and the settling of the bridge structure in the water. Three steel spans remained and these were taken down, transported in trucks, and two were used by the defendants in the building in Cecil County of a bridge over Conowingo Creek. In the course of this and other work, the defendants had opened the barricades and had allowed the public to travel over the bridge, and the plaintiff had himself passed through during the daytime on November 18th and November 20th, 1927.

On the Cecil County approach the defendants had removed about one-third of the southern portion of the barricade to permit their trucks to pass. At first the opening was kept closed by planks, but this was later abandoned, and the movement of the trucks gradually encroached upon the barricade until, when all the bridge material had been hauled off, one-half of the barricade had been removed and worn away.

Between the barricade and the end of the road at the eastern abutment of the removed bridge there was no obstruction or warning provided; and the road ended at the first abutment of the destroyed bridge with a sheer drop to the river.

The approach to the bridge from the Cecil County side was by a single roadway which was built upon an earth embankment of about nine hundred feet in length and had a macadam surface of from sixteen to eighteen feet in width; except at the entrance to the bridge, where it was not much wider than the traveled way. The roadway gradually ascended from a height of about three feet above the level of the ground to a height of from twenty to twenty-five feet at the abutment at the entrance to the bridge. The lowland on

either side of this approach was frequently covered during high water, and on the night of December 17th the river was in flood and had spread on either side of the approach to within fifty feet of the barricade.

The plaintiff testified that at no time had he seen the notices about the closing of the bridge to public travel, although he had passed them in the day time on November 18th and 20th as well as on the night of December 17th. In the course of his testimony, the plaintiff twice denied having seen either the barricade in Cecil County or in Harford County, before the night of his injury, although he also testified that on November 18th he had noticed the "Road End" sign on the barricade on the Cecil side. It is clear that he necessarily saw both barricades. *Fulton Building Co. v. Stichel,* 135 Md. 549; *Sullivan v. Smith,* 123 Md. 556. However, on December 17th he did see the Cecil County barricade surmounted by the sign whose warning "Road End" was flashed to him from the reflected rays of the headlights of his automobile. The remaining half of the barricade confronted him as he approached on the right side of the road, and he had to deflect to the left to proceed. He did not stop to investigate, but, assuming that conditions had remained as they were the last time he had driven that way, went ahead at the rate of about twenty miles an hour, and when at the edge of the abutment saw the bridge was gone; applied his brakes, but the automobile was too close for the brakes to function, and it plunged over the abutment into the river, the back wheels marking the surface of the road for four feet. The plaintiff's testimony was that the accident took place at a few minutes after eight in the evening, and that he could not see the removal of the bridge in time to prevent the accident, because the night was so cloudy and foggy that he could not see farther ahead than the width of the courtroom at Bel Air. The floor of the bridge had been on a line with the roadbed, and a metal lattice guard had run along either side, and the superstructure of the spans had extended aloft on the sides and overhead. The plaintiff was familiar with the location and substantial structure of the former bridge as it had

existed before its destruction nearly a month before. Even on the foggy night, it is difficult to understand how the plaintiff, if moving so slowly and carefully, could have failed to perceive the void ahead in time to stop. However, the decisive point in this case is not what took place when the plaintiff drove over the abutment, but his conduct at the barricade.

From the time the plaintiff drove upon that portion of the former highway extending nine hundred and more feet eastwardly from the old Conowingo bridge, he was upon the private property in fee of the power company that had been acquired to provide the bottom for its lake. Nor can it be said that he was allured or invited by the power company, since it had constructed a concrete highway to carry the travel across the river in the place of the bridge and its approaches, and signs had been posted indicating the new course of travel, and notices had been set up giving warning that the bridge would not be in public serice after November 14th. It is true that the power company did not place any obstruction upon the former highway at the extreme eastern point, where it ceased to be a highway and became private property, but it is also true that about midway this distance, or seven hundred and twenty feet east of the Cecil County entrance, a barricade was put up which made the way impassible, and there a sign by day and night to vehicular travel announced unequivocally the road's end. So, at this safe distance the traveler was stopped with the peremptory notice that the road was at an end; and all question of the traveler being there of right, by inducement, invitation, or by license ended at his encounter of this barrier and its plain notice. If the traveler went on he became a trespasser. In the course of a few weeks, the authorized use by the landowner of its property caused it and its agent to remove enough of this barricade to permit the power company to enjoy its property. In this lawful use, the opening in the barricade widened, and, at the time of the accident, but one-half of the roadway continued to be obstructed. The half of the road remaining impassable was the northern half, which the traveler directly encountered as he drove on the right of the road toward the

site of the former bridge, and the notice of "Road End" surmounting the barricade informed the traveler that, although physically blocking but one-half of the way, the barricade actually applied to the whole width of the roadway from that point westward, and, therefore, the traveler was advised that he could not venture farther, except as a trespasser.

The roadway was on a rising embankment across low land which was frequently flooded, so the roadway gave to the power company its only passageway to and from the bridge and across its property at this point. The proprietor was not required to make and maintain this way impassable in order to keep those off its property who in law are bound to know its boundary at their peril. It would be an unreasonable degree of care for the owner to have to surrender its right to make a lawful use of its land in order to make it impossible for a trespass to be committed by a stranger. The duty which the owner of the land here owed a traveler, whose use of the abandoned part of the public way in the belief that it was a subsisting highway should be anticipated as probable, was to advise or warn him in some appropriate and unmistakable manner that the traveler had no right to proceed on the way beyond a certain point, provided this point were fixed at a great enough distance, from where the peril of the road's end began because of the removed bridge, to prevent any danger to the traveler of ordinary prudence who in the exercise of reasonable care and caution should observe and heed suitable and adequate notice. Should the traveler ignore such a notice and persist in a use of the way, he forthwith ceases to be anything but a trespasser, and the owner is not bound to provide against the danger of accident. *Benson v. Balto. Traction Co.,* 77 Md. 535; *Kalus v. Bass,* 122 Md. 467, 470, 471; *Stansfield v. Ches. & Pot. Tel. Co.,* 123 Md. 120, 124; *Baltimore v. De Palma,* 137 Md. 179, 189-191.

In the appeal at bar, the defendants had not, directly or impliedly, given the plaintiff permission to use the surrendered public roadway beyond the barrier interposed in the path of the vehicular travel to the bridge. The defendants

were engaged in preparing the land for its dedicated use, and this involved the destruction of the bridge and the highways within the defined limits of the projected lake. The visitor to the premises must take them as he finds them, with the risks inherent to their use, and the owner and his agents owe him no duty to alter or change the transitory conditions of the premises as these, from time to time, vary in the course of the transformation being wrought. So, the fact that the plaintiff about a month before disregarded the notice and drove by the barrier and over the bridge does not make the plaintiff any the less an intruder or give him any right to believe there had been no change.

The physical changes which resulted from the destruction of the bridge, and the barrier and sign erected, negative any assumption that the defendants were consenting to travel beyond the barrier. So, that others trespassed and went beyond the barrier, and turned back when the peril at the abutment was encountered, does not enlarge the plaintiff's rights. *Bohlen, Studies in the Law of Torts,* pp. 175-181. As was said by Judge Alvey in *Maenner v. Carroll,* 46 Md. 193, 212: "The fact that persons were in the habit of passing over the lot, gave to the plaintiff no right to do so; and unless there was such right there was no breach of duty on the part of the defendants in cutting and leaving open the excavation. A party has the right to use his land as he pleases except as he may be restrained by duty to the public or to private individuals." *Ibid.* 222. See *Steuart v. State,* 20 Md. 106, 107.

As has been seen, the plaintiff had no right to the use of that section of the road where he was traveling, since it was a part of the lake bottom that would be a long distance from any shore of the lake, and since the section mentioned had been previously abandoned as a public way and the title to the land conveyed, and full possession surrendered to the power company. Consequently, under the given circumstances, between the barrier and the termination of the extinct public way at the bridge, the defendants owed to the plaintiff no duty except that of refraining from active negligence or doing him wilful injury. The dismantling of the

bridge was not a wrongful act nor the breach of some positive duty to the plaintiff. Moreover, the removal of the bridge and the resulting situation were not a concealed cause of mischief, since the opening produced was as wide apart as the banks of the river, and its danger as manifest and bold as the waters of the Susquehanna. The only sound reason that the traveler could assign for his failure to see that the heavy superstructure and deck of the bridge were gone was the fog of a freezing winter night. Even if the plaintiff had been a licensee, the darkness would not have made the defendants responsible. In *Reardon v. Thompson,* 149 Mass. 267, Justice Holmes, who spoke for that tribunal, said: "But the general rule is that a licensee goes upon land at his own risk, and must take the premises as he finds them. An open hole which is not concealed otherwise than by the darkness of night is a danger which a licensee must avoid at his peril." *A fortiori* the plaintiff can have no right of action for a condition not inherently dangerous, but rendered so by the darkness of a foggy night, in a part of the owner's premises to which there was no invitation. *Hounsell v. Smyth* (1860), 7 C. B. N. S., 731. Furthermore, there was no element of concealment or of "something like fraud" in the act of the defendants. See *Steinwedel v. Hilbert,* 149 Md. 121, 124-126. The destruction of the bridge was a work of magnitude openly accomplished some weeks before the night of the wrong alleged. In addition to the barricade, with its sign giving a warning which was visible by day and at night, clear, legible, official, and conspicuous notices that the way over the bridge would not be open to public travel after November 14th, 1927, were suitably placed to attract attention at intersecting highways, and should have been observed by the driver of an automobile in the exercise of the care and caution of a person of ordinary prudence. *Smith v. Lowell,* 130 Mass. 336.

This court said in *Balto. & O. R. Co. v. Allison,* 62 Md. 479, 487: "In *Maenner v. Carroll et al.,* 46 Md. 212, which was a suit for injury received by falling into an excavation which had been dug in the private property of the defendant,

over which persons were in the habit of passing, but which was not a public highway, this court declared the same principle as controlling, and adopted the language of the court in *Hounsell v. Smyth,* 7 C. B. N. S. 731, that in such cases 'one who uses the waste has no right to complain of an excavation he finds there. He must take the permission with its concomitant conditions, and, it may be, perils.' " And in *Balto. & O. R. Co. v. Walsh,* 142 Md. 230, 239-240, the principle stated in *Maenner v. Carroll, supra,* and later cases, is recognized and applied in a clear and discriminating opinion by Judge Offutt. So, this discussion may be brought to a conclusion by a further quotation from *Maenner v. Carroll, supra,* as it is strikingly in point: After closing a citation of cases with *Gautret v. Egerton,* L. R., 2 C. P. 371, Judge Alvey said for the court: "In the case last cited the question was also raised upon demurrer as it is in the case before us; and there the declaration stated that the defendants were possessed of land with a canal through it, and a bridge over the canal; which land and bridge were used *with the consent and permission* of the defendants by persons passing to and from certain docks; that the bridge was wrongfully and improperly kept by the defendants, and that one G., while lawfully passing over the bridge, fell and was drowned, by reason of the unsafe condition of the bridge. It was held that there was no cause of action disclosed under the statute giving a remedy for the death of a person by the wrongful act, neglect or default of another." Page 218. In the *Maenner v. Carroll* case, as in the one now at bar, there is nothing in the record to justify the conclusion that the plaintiff was in any manner invited or induced to pass the place where the accident occurred.

If the plaintiff had been invited or licensed to pass over the roadway beyond the barricade, and, without warning, the defendants had done something to make it dangerous for him to use the way, a different question would have been presented. But a landowner and his agent are not chargeable with setting a trap for a plaintiff by permitting an element of danger to arise in the lawful use of the land at a place to

which they neither invite nor expect a person to go. It was incumbent upon the plaintiff to establish by proof that the injury of which he complains was caused by some negligence of the defendants, and since the accident of the plaintiff was not shown to have been attributable to any breach of duty owing to him by the defendants, it was error for the trial court to refuse the prayer of the defendants taking the case from the jury. *Supra;* and *Benson v. Balto. Traction Co.,* 77 Md. 535, 541-543, 546; *State v. Wash., B. & A. Rwy. Co.,* 130 Md. 603, 615; *Baltimore v. De Palma,* 137 Md. 179, 184-189; *Cooley on Torts* (3rd Ed.), pp. 1258, 1268, 1413; *Bigelow on Torts* (7th Ed.), secs. 730, 734, 738.

> *Judgment reversed, without awarding a new trial, with costs to the appellants.*