HENSLEY, a minor, etc., ET AL. *v.* HENKELS
& McCOY, INC.

[No. 278, September Term, 1969.]

*Decided June 5, 1970.*

The cause was argued before HAMMOND, C. J., and
McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*John D. Connelly* for appellants.

*Hal C. B. Clagett,* with whom were *Thomas A. Farring-
ton* and *Sasscer, Clagett, Powers & Channing* on the
brief, for appellee.

SMITH, J., delivered the opinion of the Court.

This case is an admitted attempt at an end run around the oft-expressed Maryland doctrine which states, "[T]he owner of land owes no duty to a trespasser or licensee, even one of tender years, except to abstain from wilful or wanton misconduct and entrapment." The most recent pronouncements of this doctrine are found in *Hicks v. Hitaffer*, 256 Md. 659, 261 A. 2d 769 (1970), and *Mondshour v. Moore*, 256 Md. 617, 261 A. 2d 482 (1970). We shall sustain the action of the trial judge who refused to permit the end run.

Appellee, Henkels & McCoy, Inc., is a contractor which on April 12, 1967, was engaged in the construction of a utility line for Potomac Electric Power Co., Inc. (PEPCO). It does not clearly appear whether PEPCO owned in fee simple the land upon which the line was being erected or whether it merely owned an easement across the land, nor is it necessary to our decision.

High towers had been erected. The manner of stringing the wires between these towers called for the hanging of pulleys from the cross arms of the towers. Rope was strung through the pulleys. It looped from one tower down toward the ground and then up to the next tower. The operation was described in the words of the general superintendent of the construction as follows:

"Q. Now, how is this rope that has been referred to put on the towers and what do you mean by pulling it up at the end of the day? A. Well, to answer your first question how is it put on the towers, we have what we call running blocks that we hook underneath the insulator string. When these are installed in the air there is a small line of about a quarter of an inch attached in the block and which is let down all the way to the ground on every tower down the line. And as we bring our rope up to each tower the small line is untied from its location, tied onto the big rope and by hand a couple of guys pull

it up through the block and down, attach it to a truck and go to the next tower and you repeat this process until you are fully through all the towers. This rope is—this is what they call slack lining in the business. This rope will drape between your towers and in most cases goes to the ground. But when it gets to the end tower then this truck stops, you put this winch or big pulley on the side of the truck, take a couple of loops around the winch and secure it at the opposite end from where you are pulling and slowly take up your slack until you get it up to the approximate location of the system conductor and then you tie it on."

One witness described the rope as coming within two feet of the ground. The distance between the truck and the place where the rope was tied down was estimated at 3,000 feet. The truck was out of sight of the area where this incident occurred. The method here used was described as the usual one for getting conductor lines strung up on the towers. Normal procedure was for the line to be pulled up before the end of the working day.

On the day in question young Hensley, then 10 years of age, went out to play on the land upon which the power line was being erected. He began swinging on the rope while waiting for friends. At this time the contractor began taking up the slack in the rope. Young Hensley said, "[I]t went up kind of fast at first, and then I was too scared to let go. * * * It stopped for, might have stopped for a second". He looked down and "was scared". "Up top it stopped around five seconds and then [he] started going hand over hand and then they reeled [him] in." He was going toward the back yard of a neighbor "[b]ecause it was lower". "[W]hen they reeled [him] in [he] just went back there and [he] couldn't hold on any longer and [he] just fell".

Suit was brought on behalf of young Hensley for his injuries and his father sued for expenses. A jury re-

turned a verdict of $37,000.00 in favor of the boy and $5,400.00 in favor of the father. Judge Powers directed entry of a judgment *n.o.v.*

Hensley notes that in *State v. Machen,* 164 Md. 579, 165 A. 695 (1933), Chief Judge Bond said for the Court:

> " '* * * The licensee must take the premises as he finds them. At most, he can claim only that the licensor shall abstain from entrapping him to his harm; *shall not create new and undisclosed sources of danger without warning him of the change in situation.*' Burdick, *Law of Torts* (4th Ed.), 548." Id. at 583. (emphasis added);

and that this statement was repeated in *Brinkmeyer v. Iron & Metal Co.,* 168 Md. 149, 153, 177 A. 171 (1935); and in *Myszkiewicz v. Filling Stations,* 168 Md. 642, 648, 178 A. 856 (1935). From these statements Hensley here fashions his argument in his attempted end run.

Although there was no evidence of children's playing on the lines in question prior to the current incident, there was evidence of use of the land upon which the pole line was erected as a means of going to and from church and school, as a football field, and as a place to play with sleds when snow was on the ground. There was testimony from a neighbor that the children passed over the area going to and from school at the same time workmen were there and one of the foremen testified that employees had chased boys away from the rope earlier in the day.

Hensley believes on the strength of the cases just cited and *Jackson v. Penna. R. Co.,* 176 Md. 1, 3 A. 2d 719 (1939); *Power Co. v. Jeffress,* 159 Md. 465, 150 A. 788, 71 A.L.R. 1198 (1930); and *Maenner v. Carroll,* 46 Md. 193 (1877), that the contractor has here "created a new and abnormal condition which increases the danger beyond that which the licensee had reason to regard as naturally attaching to his habitual use", and that "[i]n such case the owner or possessor of land must give no-

tice of the change to the bare licensee", that no such notice was given and, therefore, the contractor is liable to Hensley.

We first turn to an examination of each of the cases cited by Burdick in his work for the proposition that the licensor "shall not create new and undisclosed sources of danger, without warning him of the change of situation" in an effort to determine the meaning intended by the author. We find that none of those cases support the position here taken by Hensley.

In *Beck v. Carter*, 68 N. Y. 283, 23 Am. R. 175 (1877), excavation was done in close proximity to a highway. In holding the owner liable for the injuries sustained by one who fell in the excavation, the court said:

> "It was not the case of a bare permission by the owner to cross his land adjoining a public street. The land had, by use long continued, been made, for the time being, a public place, and part of the highway. It was very probable that injury would occur if the area was left uncovered. The boundary of the alley was not defined, and persons crossing the lot in the usual way were not trespassers. It is quite conceivable that so long as the hotel building stood, it was an advantage to the owner that the unoccupied part of the lot should be open to the public. We think the defendant could not, under the circumstances, make a dangerous excavation and leave it unprotected without responsibility to those accustomed to use the lot as part of the highway, and who, while exercising due care, were injured by falling into it." *Id.* at 293.

In *Heskell v. Auburn L. H. & P. Co.*, 209 N. Y. 86, 102 N. E. 540 (1913), the suit was by a telephone company employee against an electric company. Telephone wires were placed upon the pole of the electric company with "the gratuitous permission of the [electric company], implied through its passive acquiescence". "[T]he intestate

was directed by the telephone company to ascertain and report to it what was to be done to remedy a reported defective condition of the telephone wires and he came in contact with the [electric] wire while he was executing the direction." At page 92 the court said, "[T]he sole duty of the [electric company] was abstention from inflicting intentional or wanton or willful injury." It then went on at page 94 to distinguish *Braun v. Buffalo General Electric Co.*, 200 N. Y. 484 (1911), saying:

> "In the *Braun* case the intestate was injured while upon the property of his employer, across which ran the wires of the defendant therein, who might reasonably have apprehended that conditions might arise or exist through which the owner of the property or his employees might come in contact with the wires. Had the wires of the [electric company] here been upon a pole of the telephone company it would have been under the duty toward the intestate of exercising reasonable care to maintain a proper insulation."
> *Id.* at 94.

Close reading of the two cases of *Lepnick v. Gaddis*, 72 Miss. 200, 16 So. 213 (1894), and 18 So. 319 (Miss. 1895), cited by Burdick reveals that they are of no help to Hensley. In the later case of *Ingram-Day Lumber Co. v. Harvey*, 98 Miss. 11, 53 So. 347 (1910), also cited by Burdick, no liability was held to exist when an individual took passage on a logging train "in the furtherance of some purpose of his own in seeking employment", the court holding that in going upon the private lands of the logging company the decedent took upon himself all the risk of such entry. It distinguished the case of *Albion Lumber Co. v. De Nobra*, 72 F. 739 (9th Cir. 1896), stating:

> "Under this promise of employment, and at the request of the general manager, in furtherance of the business which he represented, the party took passage, and was killed by the negligence

of the company, and of course it was liable. The above statement of the De Nobra case shows how widely these cases differ in their facts.

"It is our judgment that no cause of action is shown by the facts of this case * * *." *Id.* at 19-20.

In *Fox v. Warner-Quinlan Asphalt Co.*, 204 N. Y. 240, 97 N. E. 497, 38 L.R.A. (N.S.) 395 (1912), cited by Burdick, an individual was injured when crossing land as a short cut from one street to another. The court reiterated the Massachusetts rule that a licensee goes upon land at his own risk and must take the premises as he finds them. It pointed out that all the defendant did in that case was to continue an excavation upon its own land which it had the right to begin and that all of this was done openly and visibly. It stated that the plaintiff was thoroughly familiar with the locality, knew that the excavation was going on, and that its trend was toward the short cut across the defendant's land. It then said, "It has been declared by this court that dangerous work in plain sight is notice to a mere licensee." *Id.* at 245.

In *Thompson v. B. & O. R. R. Co.*, 218 Pa. 444, 67 A. 768 (1907), a child was injured on a railroad turntable. The court expressly rejected the attractive nuisance doctrine, stating:

"The doctrine is a sweeping innovation on the settled common-law rule that a landowner is not liable for the condition of his premises to one who enters them without permission. We are of opinion that it is not sound in principle, and that it cannot be sustained." *Id.* at 451.

The only portion of the opinion that might be said to give aid and comfort to the position of Hensley here is the statement of the court in discussing *Rachmel v. Clark*, 205 Pa. 314, 54 A. 1027, 62 L.R.A. 959 (1903), where it said:

"The negligence was in placing on a public way,

where all persons had a right to be, a slab of slate in such a position that the touch of a child's hand would cause it to fall." *Id.* at 449;

together with the further comment:

"The establishment of such a duty [attractive nuisance] would create a restraint, which in some cases would amount to a prohibition, upon a mode of beneficial use of land, for the protection of intruders and intermeddlers. It is difficult to see any ground upon which such a duty can be placed. An owner is not liable for leaving his land in its natural shape. Why should he be held liable for placing structures upon it which are harmless in themselves and are necessary for the lawful use he wishes to make of it? It cannot be said that he invites or allures children because no such intention in fact exists, nor that he sets a trap for the innocent and unwary." *Id.* at 450.

This case is here examined as a basis for the conclusion of Burdick, an examination in no way altered by the fact that its holding relative to attractive nuisance was later overruled. See *Thompson v. Reading Co.*, 343 Pa. 585, 23 A. 2d 729 (1942).

In *Weaver v. Carnegie Steel Co.*, 223 Pa. 238, 72 A. 552 (1909), the facts were similar to *Benson v. Baltimore Traction Co.*, 77 Md. 535, 26 A. 973 (1893), since a guest who had previously sought permission to visit a steel mill was injured in the process of the visit. The court denied liability, holding that an opening concerning which there was controversy "was part of the apparatus arranged for the convenient and proper operation of the mill, and was in no sense a trap or an obstruction to anyone making good use of his senses." *Id.* at 240.

*Chicago & R. I. & P. Ry. Co. v. Payne*, 103 Ark. 226, 146 S. W. 487, 39 L.R.A. (N.S.) 217 (1912), the last case cited by Burdick, is of no help to Hensley. Recovery

was there denied when the railroad in order to drain its right of way dug a ditch across the foot path on its right of way that had been used by the public with the railroad's permission for ten years. It put piles of dirt in the roadway five or six feet wide and two or three feet deep. The plaintiff had walked to church on the pathway and had crossed over the piles of dirt and noticed them. Liability was denied.

Having determined that the cases cited by Burdick are of no assistance to the establishment of the doctrine espoused by Hensley, we turn to an examination of the Maryland cases. The oldest of those is *Maenner v. Carroll, supra.* In that case there was a specific argument by counsel:

> "[I]t is * * * clear [a licensor] has no right to render the way dangerous, without notice to the licensee. In this case the averment is distinct, that [the licensor] did render the way very much more dangerous, whilst [he] neither revoked the license nor notified the licensee, nor took any precaution to avert the results of [his] act. The licensee is lulled into a fancied security, by the fact, that the license is not revoked." *Id.* at 207.

It was claimed in that case that the defendants owned an open and unenclosed lot in Baltimore, that persons had been permitted for many years to pass over it, that the defendants cut a deep excavation on the lot in a dangerous and exposed portion leaving it in a dangerous condition, and that the plaintiff, while passing over the lot at night, being ignorant of the excavation, fell in the excavation and was injured. Judge (later Chief Judge) Alvey there said for the Court:

> "There is no doubt, however, of the general proposition, that an obstruction or excavation made on a party's own land, and lawfully made, may give rise to an action, upon proof that such obstruction or excavation was concealed, and

the plaintiff was invited or induced by the act or conduct of the defendant to pass over or near such obstruction, in ignorance of its existence, whereby injury resulted. In such case the plaintiff would have a right to rely upon the good faith of the defendant." *Id.* at 218.

In denying liability, the Court further said:

"But, upon the assumption that there was a license or permission to the plaintiff to pass over the lot, it is contended that notice or warning should have been given of the existence of the excavation, according to the principle of *Corby v. Hill,* [4 C.B., N.S. 556] and that the defendants committed a breach of duty in their omission to give such notice or warning. To this, however, it may be answered, that, even conceding the license or permission to pass as claimed by the plaintiff, and that warning of the obstruction in the way should have been given, yet we think very ample warning was given, under the circumstances of the case, in the progress and condition of the work itself." *Id.* at 224.

In *Power Co. v. Jeffress, supra,* the automobile of the plaintiff plunged into the Susquehanna River at a point where the old Conowingo Bridge had been located, but after its removal. The area in question had been transferred by the state to the Susquehanna Power Company. The land in question was ultimately to be a part of the lake bottom. When the road was closed upon the opening of a highway across the Conowingo Dam, the State Roads Commission erected certain barricades. The power company later removed a part of the barricades to permit access to the area of the former bridge for the purpose of demolition and to remove some of the steel spans to another location. Signs had been erected by the State Roads Commission giving notice that the bridge would not be in public service after November 14. There was a "road end"

notice on that portion of the barricade which remained. In denying liability the Court said:

> "If the plaintiff had been invited or licensed to pass over the roadway beyond the barricade, and, without warning, the defendants had done something to make it dangerous for him to use the way, a different question would have been presented. But a landowner and his agent are not chargeable with setting a trap for a plaintiff by permitting an element of danger to arise in the lawful use of the land at a place to which they neither invite nor expect a person to go." *Id.* at 475-76.

The "if" portion of the above quotation is, of course, dictum. The situation there involved is distinguishable from this case. Where one has been licensed to pass over a road and then, without warning, a bridge in that road is removed, there would be an obvious entrapment which would be vastly different from this case.

In *State v. Machen, supra,* Chief Judge Bond said for the Court:

> "The question submitted is: Given the facts that boys of ten years, among other children, were accustomed and permitted to play on this open land, that grading operations which had been carried on by the owner left in a bank at one place a cavity to which some ten-year-old boys were attracted as a place suitable for digging an enlarged cave or tunnel, that for several weeks the boys dug and enlarged the cave, all with the knowledge and acquiescence of a caretaker on the property, was there a legal duty cast upon the trustee holding the property to protect the boys from danger of caving in of the earth, and was such a duty violated in the caretaker's failure to perform it? * * *
> "In several cases this court has had to con-

sider claims of persons on property of others by license or permission, as distinguished from invitation or inducement. *Maenner v. Carroll*, 46 Md. 193; *Balto. & O. R. R. Co. v. State, use of Allison*, 62 Md. 479; *Benson v. Baltimore Traction Co., supra; Kann v. Meyer*, 88 Md. 541, 41 A. 1065; *Baltimore v. De Palma*, 137 Md. 179, 112 A. 277. And the decisions in those cases have declared the familiar principle that permission or license gives leave only to take the property as the visitors find it, and that the owner or occupant undertakes no duty to those visitors who come for their own pleasure or convenience, and not at his invitation or upon inducement, express or implied, from a common advantage, except that, being aware of their presence, he must not injure them wilfully or entrap them. 'A licensee must take the property as he finds it, and is entitled only not to be led into danger by "something like fraud." ' *Pollock, Torts*, (11th Ed.), 544. 'He who is receiving the gratuitous favors of another has no such relation to him, it is said, as to create a duty to make safe or better than it happens to be, the place where the hospitality is tendered. The licensee must take the premises as he finds them. At most, he can claim only that the licensor shall abstain from entrapping him to his harm; shall not create new and undisclosed sources of danger without warning him of the change in situation.' *Burdick, Law of Torts*, (4th Ed.), 548. And whatever differences there may be between the legal positions of trespassers and persons present by permission, to this extent they are the same; the rule stated applies to both. See *Benson v. Traction Co.*, 77 Md. at page 542, 26 A. 973. The trap, or 'something like fraud,' which is mentioned as a ground of liability to licensees, is commonly illustrated by the case of *Corby v. Hill*, 4 C.B.N.S.

556, explained at length in *Maenner v. Carroll, supra*. There, a pile of slates was placed without warning in a roadway used by visitors so as to catch them by surprise; and it caused an accident. Judge Alvey distinguished the case of *Maenner v. Carroll* by the fact that the work during which the injury in the latter case was caused had been going on for six months, and therefore there had been no lack of warning. See *Beck v. Carter*, 68 N. Y. 283; *Davis v. Railway Co.*, 58 Wis. 646, 17 N. W. 406; 3 *Shearman & Redfield, Negligence* (6th Ed.), sec. 705; 1 *Beven, Negligence*, 563; *Lowery v. Walker* (1911), A. C. 370." *Id.* at 582-83.

In *Brinkmeyer v. Iron & Metal Company, supra*, iron pipes shifted their position and injured a boy watching a baseball game from the pile. It was claimed that additional pipe had been placed on the pre-existing pile so as to create a new and undiscovered source of danger without any warning to the public. Liability was denied with an extensive quotation from *State v. Machen, supra*, and the further comment:

"There is no allegation that the unsafe condition which resulted in the accident could not have been discovered by a licensee exercising due care. The defendant's limited liability to those using its property by gratuitous permission did not require an assumption that they would not themselves observe a proper degree of care for their safety." *Id.* at 155.

In *Myszkiewicz v. Filling Stations, supra*, a pedestrian walked across the concrete way of a filling station between streets with the defendant's tacit permission. She slipped and fell on what was claimed to be oil or grease. The Court in denying liability said:

"It does not appear on principle how what was not a latent or concealed danger but one

where the licensee had full opportunity for inspection and which was as open, apparent, and expectable to the licensee as to the licensor, should impose upon the licensor any particular pains either to make the use of the way safe to the licensee or to ascertain its true condition and guard the licensee against danger. Particularly is this true as the oil or grease spots on the way were not abnormal, but such as might be expected to exist in the legitimate use of the premises by the defendant. The tolerated intruder must take the premises as he has found them, and can only demand notice of any new and abnormal condition which increases the danger of the condition which the licensee has been permitted by the licensor to regard as naturally attaching to his habitual user. *State, use of Lorenz, v. Machen,* 164 Md. 579, 582, 165 A. 695; *Bohlen on Torts,* 161; *Am. L. Inst. Restatement, Torts,* vol. 2, sec. 340, subsec. (e), sec. 341, subsecs. (a), (d). The reason is that there is no bond of interest between the mere licensee and the occupier of the premises. The plaintiff was not bound to use the way, nor was the owner bound to make it any safer merely because he suffered the use by the licensee of a way which had no peril which was not expectable and obvious to the user." *Id.* at 647-48.

In *Jackson v. Penna. R. Co., supra,* a suit was brought against the railroad company by a pedestrian injured while walking on the tracks of the defendant near a street crossing and near a well-worn foot path which crossed the railroad right of way. The matter reached this Court by way of appeal from an order sustaining a demurrer. Liability was denied, the Court pointing to the fact that plaintiff did not go on the right of way by an express or implied invitation, that he was at most a trespasser or bare licensee, that he had no business of any kind with the carrier, he was engaged in appropriating for his own

convenience private property whose railway tracks and their use were a danger signal to him and a warning of the perils he might encounter, "[t]he men in charge of the engine and train were not bound to stop or even to lessen the speed of their equipment, unless they saw there was danger of a collision with a person upon the track who had no opportunity to escape, or whom they saw in a use of the footway which would probably result in a collision, unless they could avert it in the exercise of reasonable care and diligence according to the circumstances," and "the duty of the owner of the property to the bare licensee with respect to the licensee's use of the property is not covertly to alter the property so as to create a peril which is not obvious and expectable to the user".

The Hensley end run must fail since it is apparent that neither the statement from Burdick nor the statements from the various Maryland cases are authority for the type of exception to the Massachusetts rule here sought. Careful reading of all of those cases makes it quite plain to us that what was meant was there could be no entrapment, concealment or presentation of a deceptive appearance, "something like fraud", by a licensor without liability. As put by Judge Chesnut in *Jones v. City of Aberdeen*, 138 F. Supp. 727 (D. Md. 1956), *aff'd sub nom. Jones v. U. S.*, 241 F. 2d 26 (4th Cir. 1957) :

> "As to the licensee the Maryland law is clearly established that the owner is not responsible for accidents happening to a licensee other than those caused by hidden or secret dangers or pitfalls which were known or ought reasonably to have been known to the owner and as to which no warnings were given to the user." *Id.* at 731.

Maryland has specifically rejected the attractive nuisance doctrine. *Conrad v. City of Takoma Park*, 208 Md. 363, 369, 118 A. 2d 497 (1955). The fact that the child was injured on or by a chattel does not change the trespass-licensee doctrine. *Mondshour v. Moore, supra; State*

*v. Fidelity Warehouse Co.,* 176 Md. 341, 4 A. 2d 739 (1939).

In this case there was no covert change or entrapment. There was no hidden danger or secret pitfall. Hensley was not allured, induced, invited, or persuaded by the licensor to enter onto the right of way nor to swing upon the ropes. As one of the friends of young Hensley put it when asked if he had swung on the rope and if he knew that he wasn't supposed to do it:

"Common sense would have told me * * *".

We repeat the recent but now oft-quoted comment in *Herring v. Christensen,* 252 Md. 240, 249 A. 2d 718 (1969):

"To adopt appellants' position would eliminate the consistency and stability in this Court's rulings which are necessary for our citizens to know their respective rights and obligations." *Id.* at 242.

*Judgment affirmed, appellant to pay the costs.*