271 P.2d 399

MELLAS   v.   LOWDERMILK et al.

No. 5746.

Supreme Court of New Mexico.

June 5, 1954.

Keleher & McLeod and John B. Tittmann, Albuquerque, for appellants.

Harry L. Bigbee, Donnan Stephenson and Claude S. Sena, Santa Fe, for appellee.

LUJAN, Justice.

On July 20, 1952, George Mellas, nine years, one month and four days old, was drowned in a pond located on a tract of land belonging to the defendants. Subsequently this action was brought by his fa-

ther, Mike Mellas, as administrator of his son's estate, to recover for his alleged wrongful death. § 24–101 et seq. 1941 Comp. A jury trial resulted in a verdict and judgment in favor of the plaintiff for $22,500.

Defendants' motions for a directed verdict, both at the end of plaintiff's case and at the close of the entire case, and their subsequent motion for a judgment non obstante veredicto were denied, and defendants have appealed.

This suit is brought upon the theory that the defendants maintained upon their premises an attractive nuisance and in this connection the complaint alleged that for a considerable period of time the defendants were the possessors of land within the community of Fairview in Rio Arriba County; that they negligently maintained an artificial body of water, one which the defendants knew or should have known, and which they realized or should have realized, involved unreasonable risk of death or bodily harm to the decedent. Paragraph ten alleges:

"That by reason of the negligent maintenance of the aforesaid artificial condition and its appearance, it was attractive to children of tender years in general, including the minor decedent and other children similarly situated, and was calculated to and did arouse his and their childish curiosity and desire to play therein and thereabout, and by reason thereof constituted an attractive nuisance, all of which said facts were known or in the exercise of ordinary care should have been known to the defendants."

The defendants own and operate a heavy construction business, being engaged primarily in the construction of highways. The property is situated along the Rio Grande River where a pond was constructed during the winter of 1945–46, when certain flood control work was done by the Bureau of Reclamation, which resulted in a dike cutting off a prior bend in the river. River water seeped into the depression behind the dike, forming a pond in the shape of a horse shoe. A diving board was erected on one of the banks. The pond contained fish and had a growth of weeds at the bottom. This pond is located four hundred paces or approximately one thousand feet west from U. S. Highway 64 and is not visible therefrom. A raft nineteen feet long and six feet nine inches wide, constructed of two 12 x 16 timbers and 6 x 8 boards bolted and nailed together, is kept on the pond for the purpose of testing and servicing pumps which are used to pump water into a large storage tank. The water is used to irrigate an orchard and lawns as well as for fire protection and to service heavy construction equipment. This raft is propelled by a long pole. During the summers of 1949–1950 or 1950 and 1951 the

defendants permitted the Espanola High School coach to use said pond in conducting swimming lessons for school children. It was never dedicated to the public as a play ground, nor was it open to the public. The premises were fenced in and posted with "no trespassing" and "no swimming" signs.

The defendants claim that the court erred in overruling their motions for a directed verdict, both at the end of the plaintiff's case and at the close of the entire case.

The general rule of law applicable to this case, and which is approved by the great weight of authorities, is found in 20 R.C.L. on Negligence in Section 85, page 96, and reads as follows:

"Ponds, pools, lakes, streams, and other waters embody perils that are deemed to be obvious to children of the tenderest years; and as a general proposition no liability attaches to the proprietor by reason of death resulting therefrom to children who have come upon the land to bathe, skate, or play. * * *"

The author goes on to say that a right of recovery has been denied in cases where children from five to eleven years of age have lost their lives by drowning, although the property owner knew of the habit of children.

And in 56 Am.Jur. Section 436, page 850 the author says:

"The weight of authority is to the effect that ponds, pools, lakes, streams, reservoirs, and other waters *do not constitute attractive nuisance, at least in the absence of any unusual element of danger.* * * *

"In some cases, the view has been taken that the proprietor may be held liable where some additional or unusual element of danger is involved in the situation, as where the pond or pool is in close proximity to a highway or a playground, or where it is located in an urban or densely populated community, but the weight of authority appears to hold to the contrary, except where the facts bring the case within the rule respecting pitfalls or hazards adjacent to highways." (Emphasis ours.)

The elaborate note in 8. A.L.R.2d on pages 1299–1300, Section 43, contains reference to several decisions from different states holding that the average child of seven, eight, nine, ten and eleven years of age is charged with the knowledge of the dangers of drowning. And beginning on page 34 of 36 A.L.R. will be found a very exhaustive annotation on the doctrine of attractive nuisance. The cases with reference to ponds and pools of water are collected on pages 224 to 227, inclusive. See, also, annotations in 45 A.L.R. 990; 53 A. L.R. 1355; and 60 A.L.R. 1453.

The following cases deal with the specific question of the maintenance of ponds, with rafts or logs in the water, on private property. They are peculiarly applicable to this case, and under them no liability could attach. Robbins v. City of Omaha, 100 Neb. 439, 160 N.W. 749; Barnhart v. Chicago, M. & St. P. Ry. Co., 89 Wash. 304, 154 P. 441, L.R.A.1916D, 443; Harriman v. Incorporated Town of Afton, 225 Iowa 659, 281 N.W. 183, 184; Bass v. Quinn-Robbins Co., Inc., 70 Idaho 308, 216 P.2d 944; Baker v. Fruin-Colnon Contracting Co. (Terminal Railroad Association of St. Louis), 271 Ill.App. 300; and Hanna v. Iowa Central Railway Company, infra. See, also, McCall v. McCallie, 48 Ga.App. 99, 171 S.E. 843.

In Anderson v. Reith-Riley Construction Co., 112 Ind.App. 170, 44 N.E.2d 184, 185, Judge Flanagan said:

"Nature has created streams, lakes and pools which attract children. Lurking in their waters is always the danger of drowning. Against this danger children are early instructed so that they are sufficiently presumed to know the danger that if the owner of private property creates an artificial pool on his own property, merely duplicating the work of nature without adding any new danger, and a child, without invitation, ventures on the private property, enters the pool and is drowned, the owner is not liable because of having created an 'attractive nuisance.' "

■■ There is nothing in the record to contravene the legal presumption that George Mellas, a boy nine years old, *had the capacity to comprehend and avoid* the danger he incurred in going upon the raft in the pond where he had been the day before and was aware of the depth of the water. Fully comprehending the danger, and not using care and self-control to avoid it, he was guilty of contributory negligence as a matter of law. Heimann v. Kinnare, 190 Ill. 156, 60 N.E. 215, 52 L.R.A. 652, 83 Am.St.Rep. 123; Hanna v. Iowa Central Railway Company, 129 Ill.App. 134.

Bobby Jones, who, with his brother and George Mellas went to the pond in question on the fatal day was called as a witness for the plaintiff and he testified as follows:

"Q. I wonder Bobby if you would just tell the jury here in your own words what happened on that day. Just start out and tell the jury like you would tell me or anyone else. A. Well, we went out to Lowdermilks and we were swimming out there the day before, and we went out there the next day we got on the raft and we were pulling out in the water, I got off on the shore, my brother and George were out there on the raft yet—then they

went out farther, almost to the other side. They went to the center again and then George jumped off. My brother told him he had better get back on but he wouldn't do it. He started to dog paddle but he didn't make it, and he went under and never did come up again.

\*   \*   \*   \*   \*   \*

"Q. What did your brother do? A. He tried to give him the pole and he wouldn't take it. Then he tried to pole the raft over close enough for him to grab it and he went under before he ever got over there."

On cross-examination he testified:

"Q. Was this raft a strong raft? A. Yes, sir.

"Q. It held your weight all right, all three of you, didn't it? A. Yes, sir, it held those other seven boys with us too.

"Q. Didn't wiggle or tip, or anything like that? A. No.

"Q. How come George went off into the water? A. He jumped in.

\*   \*   \*   \*   \*   \*

"Q. Bobby tell the jury what was said. A. Well, my brother—George first said he wanted to swim, he wanted to swim the rest of the way—my brother told him not to and they had quite an argument over that, then

George went down to the end and jumped off and my brother tried to hand him the pole to get him to get on the raft and he wouldn't do it.

\*   \*   \*   \*   \*   \*

"Q. Now when you went in there that Sunday morning, July 20th, you said you came in the main gate across the cattle guard? A. Yes, sir.

"Q. That is a big gate that has Lowdermilk Brothers on top—that was the one? A. Yes, sir.

"Q. And it has some other signs there on it? A. Yes, sir.

"Q. Did you read those signs? A. One of them I did, I did not get a look at the other one.

"Q. Which one did you read, what did it say? A. No trespassing.

"Q. Did it say no swimming too? A. Yes, it did, I saw that as we left.

"Q. Was George Mellas in the same grade with you in school? A. Yes, sir.

\*   \*   \*   \*   \*   \*

"Q. Could he read? A. Yes, that is one thing he was better than I am at."

In Newby v. West Palm Beach Water Co., Fla., 47 So.2d 527, 528, the court said:

"The attractive nuisance doctrine may protect one against another's neg-

ligence; but it does not presume to protect him against his fault, bad luck, improvidence or misfortune. As much as we may sympathize with the victims of these concepts, the law nor the welfare state have yet devised a means to compensate for them. The defeat of laudable aims is often not compensable under law. Legal remedies should not be confused with Good Samaritan impulses. The Courts may enforce the former but they have no power to relieve against delicts of the latter."

In Restatement of the Law, Section 339 (e) on page 925, it is said:

"A possessor of land is, under the statement made in Comment a, under a duty to keep so much of his land as he knows to be subject to the trespasses of young children, free from artificial conditions which involve an unreasonable risk of death or serious bodily harm to them. This does not require him to keep his land free from conditions which even young children are likely to observe and the full extent of the risk involved in which they are likely to realize. The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved therein but none the less chooses to encounter it out of recklessness or bravado."

It would be profitless to review all the decisions appearing in above annotations as well as those cited by us. Broadly speaking, they may be divided into four classes. (1) Where the turn-table doctrine is entirely repudiated. (2) Where the doctrine is accepted, but confined to turntables or to attractive dangerous machinery. (3) Where it is held to cover various latent and hidden dangers. (4) Where it is held to cover, or is extended to, cases of patent and visible alluring dangers other than those arising from mechanical appliances, defects or otherwise. The case at bar is one where the facts are such as are found in the fourth of the above classifications, and the question for determination and for our consideration is whether the turntable decision should be held to cover such a case, or, if not, whether we should extend the doctrine to cover such a case.

As to the latter question, we are clearly of opinion that it should not be

extended. It is a matter of common knowledge that alluring and attractive ponds, lakes, pools and other natural and artificial bodies of water, such as the one in question in this case, are extremely useful in this state, not only to the defendants and to the mining industry in the necessary and proper conduct of their business, but to livestock men, farmers and fruit growers in watering their stock and in the cultivation of their crops. Not only ponds, pools or lakes but irrigation ditches, large and small, are equally dangerous and alluring to the child, are to be found throughout the state wherever mining, livestock raising and cultivation of land is carried on, and such bodies of water, are practically impossible to render harmless, and are indispensible for the maintenance of life and property. There is no distinction that can properly be drawn for liability for injuries received by a child from any of such various uses of water. Both as a matter of law and as a matter of public policy we feel that the so-called "turntable doctrine" should not be extended to cover such a case as is here presented.

The cases of Barker v. City of Santa Fe, 1943, 47 N.M. 85, 136 P.2d 480 and Selby v. Tolbert, 1952, 56 N.M. 718, 249 P.2d 498, relied on by the plaintiff are not helpful to him. Expressions occur in these cases which, if the facts be ignored, might be construed to sustain plaintiff's contention. But it is a cardinal rule of construction that decisions are to be construed in the light of the facts on which they are based. Each of these cases involved hidden dangers, in the instrument and body of water inflicting the injury, not apparent to those who were injured.

We have carefully examined the entire record, and are unable to find any evidence showing or tending to show defendants guilty of the wrongful acts charged in the complaint which caused the death of George Mellas. The trial court therefore erred in not sustaining the motions for a directed verdict in favor of defendants. In view of this conclusion, it is not necessary to consider any of the other errors relied upon for reversal.

The judgment will be reversed with direction to the trial court to proceed in a manner not inconsistent herewith, and

It is so ordered.

McGHEE, C. J., and COMPTON and SEYMOUR, JJ., concur.

SADLER, J., absent from the state, did not participate.