560 A.2d 1130

Danielle CASPER, an infant, etc. et al.

v.

CHARLES F. SMITH & SON, INC., et al.

Rachel KIRTSCHER, an infant, etc. et al.

v.

CHARLES F. SMITH & SON, INC., et al.

Nos. 127, 128, Sept. Term, 1987.

Court of Appeals of Maryland.

July 25, 1989.

Phillips P. O'Shaughnessy (James M. Gabler and Sandbower, Gabler & O'Shaughnessy, P.A. and C. James Sfekas, on brief), Baltimore, for appellants.

Donald J. McCartney (Connie E. Williams and Smith, Somerville & Case, on brief), Baltimore, William R. Phelan, Jr., Asst. City Sol. (Neal M. Janey, City Sol., on brief), Baltimore (Francis J. Ford, Michael P. Chervenak and Ford & O'Neill, on brief, Rockville), for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

McAULIFFE, Judge.

Tragedy struck the Casper and Kirtscher families on February 8, 1984, when Danielle Casper, age seven, and Rachel Kirtscher, age eight, fell through ice into the freezing waters of Moore's Run in Baltimore City. Both children

survived, but as a result of being submerged for twenty minutes or more, they are permanently and profoundly brain damaged. Each child and her parents brought a negligence action in the Circuit Court for Baltimore City, claiming damages against the Mayor and Council of Baltimore City as the owner of the property and against individual contractors of the city who performed work on Moore's Run nine years before the accident. The defendants filed motions to dismiss and motions for summary judgment, challenging the sufficiency of the allegations of each complaint.[1] The motions were granted and that action was affirmed on appeal. *Casper v. Chas. F. Smith & Son*, 71 Md.App. 445, 526 A.2d 87 (1987). We granted certiorari, and we now affirm.

The facts we consider are those alleged in the complaint.[2] The area of Moore's Run with which we are concerned is south of the Cedonia Avenue bridge in east Baltimore. At this point, the stream runs north and south through land that is bordered by Denview Way to the west and Cedgate Road to the east. The city owns the land and the stream. Prior to 1974, the stream bed in this area was relatively level, and at normal water levels was six to twelve inches deep. In 1974, the city entered into a contract with Charles F. Smith & Son, Inc. (Smith),[3] for storm water drainage and sewer work in the area, including the construction of a 21 inch sewer to the west of Moore's Run between the stream and Denview Way. To protect the sewer line and Denview

1. Although separate suits were brought, the allegations of each complaint concerning liability are the same. The cases were consolidated below, and in our discussion we shall treat them as a single case.

2. The defendants do not agree that the facts are as alleged. However, because they based their motions on the alleged insufficiency of the complaint, they have assumed the truth of the allegations for the purpose of the motions.

3. Smith was served with original process, but has not answered or entered an appearance. Ordinarily, pendency of the action against Smith would prevent an immediate appeal of the judgments entered in favor of the remaining defendants, but the trial judge here certified the judgments as final pursuant to Maryland Rule 2–602(b).

Way, the contract required the placement of large igneous rocks in wire mesh baskets, known as gabions, along 200 feet of the west bank of the stream. These large gabions were to be placed over a gabion "mattress," which was to be placed over existing bedrock. Smith contracted with Gabion Construction, Inc. (GCI), an additional defendant, for the construction and installation of the gabions. The final defendant in this case is Rummel, Klepper & Kahl (RKK), the engineering consultants who were hired by the city to design the project and supervise its construction.

The plaintiffs alleged that contrary to the terms of the contract,[4] Smith and GCI, with the knowledge of RKK, excavated the stream bed along the 200 foot length of the gabion construction, and did not install a gabion mattress. Additionally, plaintiffs allege that Smith and GCI repaired certain storm water and sewer lines in the area so as to increase the volume of water flowing into Moore's Run, and narrowed the banks at the point of the gabions, thereby increasing the velocity of the water. As a result, plaintiffs allege, the stream was artificially deepened through excavation and then further deepened by erosion caused by the increased volume and velocity of the water, so that what had formerly been an innocent stream having a depth of six to twelve inches became an "artificial death trap" with a depth of about five feet through the length of the gabions.

Danielle and Rachel lived within several blocks of the deepened area of Moore's Run. At 5:20 p.m. on February 8, 1984, the two girls left Rachel's home to walk Rachel's dog along Moore's Run. At a point approximately 40 feet upstream from the southern terminus of the gabions, Danielle and Rachel fell through the ice that covered the deepened area of Moore's Run. They were apparently in the

---

4. Plaintiffs contend that the contract required igneous rock of a specific gravity of 2.6 or greater to be used in the gabion baskets, and because such rock was not indigenous to the area, it was clear that the rock was to be obtained elsewhere. They allege that Smith and GCI breached the contract by excavating the existing stream bed in that area to obtain rock for the gabions.

water and beneath the ice for 20 to 25 minutes before being rescued. At the time, the water level in Moore's Run was higher than usual and was about six to eight feet deep at that point. Rachel's dog also went through the ice, near where the girls broke through. Although it cannot be known precisely what occurred,[5] plaintiffs have suggested in their complaint that the dog fell through the ice first and that the children were injured when they attempted to rescue her.

Plaintiffs' basic argument is simple. If the defendants had followed the original contract, Moore's Run would have remained shallow at this point, and the worst consequence that the children could have suffered from going onto the ice would have been wet feet. But, because Smith and GCI breached the contract, and the city and RKK did nothing about it, the stream was deepened and tragedy resulted. That argument is little more than an application of the "but for" test: but for the actions of the defendants, would the harm have ensued? That test, occasionally of limited value in ruling out the existence of causation-in-fact, has no litmus value in determining whether the other elements of a cause of action exist.

A cause of action in negligence is made out when the plaintiff proves that the defendant breached a duty owed to the plaintiff, and that the breach of that duty was a proximate cause of damage to the plaintiff. Focusing first on the claim against the city, we note that plaintiffs contend the city's duty to them arose from two separate sources. First, they argue, the city had a duty to ensure that its 1974 contract with Smith was not breached. And second, the city owed the plaintiffs a duty because of its status as owner and occupier of the land.

■ Turning first to the argument that a duty flowed from the contract, we find no merit in that contention. A

5. Profound brain damage prevents the minor plaintiffs from telling what occurred.

landowner may incur liability to a third party injured by reason of a dangerous condition created because a contractor has breached its contract with the owner, but that liability will flow from the landowner's responsibility as a landowner, and not as a result of his failure to ensure that the contract was properly performed. If Smith had breached its contract with the city by using rocks of the wrong density in the gabion baskets, that breach would be of no consequence to the plaintiffs. Similarly, if in making Moore's Run five feet deep along the length of the gabions Smith breached its contract with the city, that breach is of no consequence to the plaintiffs unless the condition thereby created on the land is inconsistent with the duty otherwise owed by the city to the plaintiffs. If the deepening of Moore's Run breached a duty owed by the city to the plaintiffs, it matters not whether the deepening occurred in strict compliance with the city's contract or because of a breach thereof. Similarly, if the deepening of Moore's Run breached no duty owed by the city to the plaintiffs, it is not made actionable simply because it occurred as a result of a breach of a contract. *See Council of Co-Owners v. Whiting–Turner*, 308 Md. 18, 32, 517 A.2d 336 (1986); *Matyas v. Suburban Trust Co.*, 257 Md. 339, 263 A.2d 16 (1970).

Turning to the city's duty as owner of the land, under current Maryland law the extent of the duty depends upon the status of the plaintiffs at the time of the accident. *Wagner v. Doehring*, 315 Md. 97, 101, 553 A.2d 684 (1989); *Rowley v. City of Baltimore*, 305 Md. 456, 464–65, 505 A.2d 494 (1986). The status of the children at the time of the accident is not readily determined, due at least in part to the absence of evidence concerning the precise nature and use of the land. The complaint tells us that the city was the owner of Moore's Run "and the adjacent land and streets;" that Moore's Run in the area in question is located in a heavily residential area of Baltimore City; and that "children frequently play in and around Moore's Run and the adjacent land [and] frequently cross over Moore's Run at various points where the water level is low" as indicated by

"well worn paths" into the stream. At oral argument we were informed that the city maintains "Moore's Run Park" in the immediate area, and that the residents of the area have long treated this portion of Moore's Run as a part of the park.[6] It is unclear whether the land in question is in fact a part of the city's inventory of park land, and if so whether the physical circumstances are such that the stream and its abutting land are reasonably perceived as a part of a designated city park, through which persons are at least implicitly invited to walk.

It seems clear that at least as to those portions of designated parks to which entry is not prohibited, the ordinary user will be entitled to the status of an invitee. *See, e.g., Ashley v. United States,* 326 F.2d 499, 500 (8th Cir.1964) (person bitten by a bear in Yellowstone National Park was invitee); *Caldwell v. Village of Island Park,* 304 N.Y. 268, 107 N.E.2d 441, 444 (1952) (discussing duty owed by municipality in the operation of various aspects of a park); *Adams v. United States,* 239 F.Supp. 503, 506 (D.C. Okla.1965) (applying Oklahoma law to reject any distinction based upon whether a fee is charged for admission to the park); *Smith v. United States,* 117 F.Supp. 525, 527 (D.C. Cal.1953) (applying California law to find implied invitation to use campsites in national forest). *See also Crown Cork and Seal Co. v. Kane,* 213 Md. 152, 159, 131 A.2d 470 (1957) (discussing implied invitations). Whether the same result obtains in favor of users of "raw" park land, carried by the city in its inventory of park property but intentionally held in its natural state, is a question that was neither briefed nor argued here, and which we do not reach.

[2] As to the city, the plaintiffs apparently face a pleading quandary. If they allege that the land in question is maintained as a park, they run squarely into the problem of government immunity. *See Baltimore v. State, Use of*

---

**6.** Extrinsic information cannot breathe life into a legally insufficient complaint, but may be considered in determining whether leave to amend the complaint would be appropriate.

*Ahrens,* 168 Md. 619, 179 A. 169 (1935). If they avoid any allegation that this land was part of a park, they run the very real risk that they cannot be afforded any status higher than that of a bare licensee. As we said in *Wagner v. Doehring, supra,* 315 Md. at 102, 553 A.2d 684, no duty is owed to a trespasser "except to refrain from willfully or wantonly injuring or entrapping the trespasser," and no duty is owed to a bare licensee "except that he or she may not be wantonly or willfully injured or entrapped, nor may the occupier of land 'create new and undisclosed sources of danger without warning the licensee.'" Notwithstanding the characterization in the complaint that the altered portion of Moore's Run constituted a "death trap," we conclude that the facts alleged fall far short of demonstrating a breach of a duty owed to a trespasser or to a bare licensee. *See Macke Laundry Serv. Co. v. Weber,* 267 Md. 426, 298 A.2d 27 (1972); *Osterman v. Peters,* 260 Md. 313, 272 A.2d 21 (1971); *Hensley v. Henkels & McCoy, Inc.,* 258 Md. 397, 265 A.2d 897 (1970); *Mondshour v. Moore,* 256 Md. 617, 261 A.2d 482 (1970); *Hicks v. Hitaffer,* 256 Md. 659, 261 A.2d 769 (1970); *Herring v. Christensen,* 252 Md. 240, 249 A.2d 718 (1969); *Carroll v. Spencer,* 204 Md. 387, 104 A.2d 628 (1954); *Pellicot v. Keene,* 181 Md. 135, 28 A.2d 826 (1942); *State, Use of Alston v. Fidelity Warehouse Co.,* 176 Md. 341, 4 A.2d 739 (1939); *Balto. City v. De Palma,* 137 Md. 179, 112 A. 277 (1920); *Benson v. Baltimore Traction Co.,* 77 Md. 535, 26 A. 973 (1893); *Mech v. Hearst Corp.,* 64 Md.App. 422, 496 A.2d 1099 (1985); *Fitzgerald v. Montgomery County,* 25 Md.App. 709, 336 A.2d 795 (1975).

■ Because the complaint might be amended to allege that the property in question was part of a park, we shall, as did the Court of Special Appeals, assume arguendo that the plaintiffs enjoyed the status of social guests or business invitees.[7] Because we are persuaded that the facts alleged

---

7. In assuming the status of invitee, we also do not reach the city's contention that even if the children were invitees upon the land, they lost that status when they ventured onto the ice or into the creek. A

do not demonstrate a breach of duty owed to an invitee under these circumstances, we need not consider the question of the city's immunity.

Bodies of water like the stream involved in this case have historically and consistently been afforded distinctive treatment in the law relating to landowners' liability. The necessity, or at least desirability, of maintaining such bodies of water, coupled with known inherent dangers and the difficulty of effectively protecting against those dangers, have led courts across the country to pronounce water an "open and obvious danger," for which no warning or special precaution is ordinarily needed. Moreover, in those states in which the doctrine of attractive nuisance may elevate the status of child trespassers to that of invitees, bodies of water are generally excluded from the operation of that doctrine. *See, e.g., Locke v. Liquid Air Corp.*, 725 F.2d 1331 (11th Cir.1984) (applying Alabama law); *Dombrowski v. Maricopa Co. Mun. Wat. Cons. Dist.*, 108 Ariz. 275, 496 P.2d 136 (1972); *Cope v. Doe*, 102 Ill.2d 278, 80 Ill.Dec. 40, 464 N.E.2d 1023 (1984); *Haden v. Hockenberger & Chambers Co.*, 193 Neb. 713, 228 N.W.2d 883 (1975); *Mellas v. Lowdermilk*, 58 N.M. 363, 271 P.2d 399 (1954); *Ochampaugh v. City of Seattle*, 91 Wash.2d 514, 588 P.2d 1351 (1979); *Waters v. United States Fidelity & Guar. Co.*, 124 Wis.2d 275, 369 N.W.2d 755 (Wis.App.1985); Annot., *Liabil-*

similar argument was made by the city in *Baltimore v. State, Use of Ahrens*, 168 Md. 619, 621–22, 179 A. 169 (1935). *See also Barnes v. Housing Authority*, 231 Md. 147, 189 A.2d 100 (1963) (tenant's child enjoyed invitee status while using paved walkway in common area maintained by landlord, but lost that status when he left the walkway and fell into an unguarded window well); *Glaze v. Benson*, 205 Md. 26, 106 A.2d 124 (1954) (although invitation may be implied from environment, and plaintiff was an invitee at a public beach, invitation did not include diving into water from dining pavilion rail); *Pellicot v. Keene*, 181 Md. 135, 28 A.2d 826 (1942) (six year old child was an invitee in the common aisles of a store, but became a trespasser when he wandered behind a counter and fell through a trap door); *Lem v. United States*, 89 F.Supp. 915 (D.C.D.C.1950) (visitor to national park enjoyed invitee status only while remaining on sidewalks designated for use).

*ity of Landowner for Drowning of Child,* 8 ALR.2d 1254 (1949).

The open and obvious danger rationale also has been applied to bodies of water partially or fully covered by ice. *Cope v. Doe, supra,* 464 N.E.2d at 1028; *Weber v. Village of Carol Stream,* 129 Ill.App.3d 628, 84 Ill.Dec. 807, 810, 472 N.E.2d 1203, 1206 (1984); *Waters v. United States Fidelity & Guar. Co., supra,* 369 N.W.2d at 759; *compare Pasierb v. Hanover Park Park District,* 103 Ill.App.3d 806, 59 Ill.Dec. 461, 463, 431 N.E.2d 1218, 1220 (1981) (finding creek unreasonably dangerous because its existence concealed by layers of ice and snow).

As the United States Court of Appeals for the Eleventh Circuit pointed out in *Locke v. Liquid Air Corp., supra,* 725 F.2d at 1334:

> These cases rest on the assumption that water, including water concealing a submerged hazardous condition, is an obvious and patent danger reasonably appreciated by any child of sufficient maturity to be allowed abroad without supervision.

The duty owed to an invitee by an occupier of land is to use reasonable and ordinary care to keep his premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover. *Henley v. Prince George's County,* 305 Md. 320, 339, 503 A.2d 1333 (1986); *Bramble v. Thompson,* 264 Md. 518, 521, 287 A.2d 265 (1972). Because water in the form of a stream or pond constitutes an open, obvious, and patent danger, the occupier of land is ordinarily not under any duty to warn the invitee of that danger. Moreover, and most significant for the purpose of this case, the doctrine of open and obvious danger permits the landowner to assume, for purposes of fulfilling his duty to others, that children of sufficient age to be permitted to come upon the property without supervision will appreciate the panoply of ordinary dangers signalled by the presence of water. This aspect of the doctrine, although occasionally more fiction than fact, has been

found to be generally sound, and necessary to strike a fair balance between landowners and those who may be injured on the land.

In *Ochampaugh v. City of Seattle, supra,* the Supreme Court of Washington considered a claim for damages arising out of the drowning deaths of two brothers, six and eight years of age, in an artificially created pond located within several hundred yards of a housing development. The pond was about 100 feet wide, shallow at the edges but reaching a depth of around six feet toward the middle. Its edges were "boggy" and there was an abrupt drop-off on one side. The bottom was muddy and covered with debris, the water was muddy, and logs, other debris and one or two rafts floated on the surface. Quoting with approval from *Peters v. Bowman,* 115 Cal. 345, 47 P. 113 (1896), the Washington court said, at 588 P.2d 1356:

> A body of water—either standing as in ponds and lakes, or running as in rivers and creeks, or ebbing and flowing, as on the shores of seas and bays—is a natural object incident to all countries which are not deserts. Such a body of water may be found in or close to nearly every city or town in the land; the danger of drowning in it is an apparent open danger, the knowledge of which is common to all; and there is no just view consistent with recognized rights of property owners, which would compel one owning land upon which such water, or part of it, stands or flows, to fill it up, or surround it with an impenetrable wall.

Applying a general negligence standard to determine the liability of the occupier of land, the Washington court held:

> With respect to natural conditions, including artificial conditions which simulate nature, the danger of which is open and apparent to everyone, this court, along with the majority of other courts ... has consistently held that the owner cannot reasonably be required to take affirmative steps to make the condition safe or to warn of its presence or to prevent access to it. In other words, in such cases, we have held that as a matter of law the probabili-

ty of injury is not great enough to warrant a conclusion that the duty of exercising reasonable care demands such affirmative acts.

*Ochampaugh,* 588 P.2d at 1358.

In *Waters v. United States Fidelity & Guar. Co., supra,* the Court of Appeals of Wisconsin held that the "open and obvious danger" principle applied not only in the case of trespassers and licensees, but also when the standard of care was ordinary negligence.[8] There, a ten year old child suffered injuries similar to those suffered by the plaintiffs in the instant case when he fell through the ice of a frozen pond while attempting to retrieve a sled. Holding that there was no duty to warn of the obvious danger presented by the pond, the court affirmed a grant of summary judgment in favor of the defendant. The court also rejected an argument that the owner of the land who knew the depth of the pond was under a duty to warn because logs frozen beneath the ice created an illusion that the water was much shallower than it actually was. The court said that this was a common condition in bodies of water, similar to the occurrence of occasional deep holes in otherwise shallow bodies of water, and was therefore a part of the open and obvious danger.

In the case before us, plaintiffs have similarly sought to avoid the consequences of the open and obvious danger doctrine by contending that the danger here was neither open nor obvious, but was in fact effectively concealed by the changes brought about by the defendants. They argue that at either end of the 200 foot stretch of deepened water, Moore's Run was quite obviously a shallow stream having a

---

8. Wisconsin, together with a number of other states, has eliminated the distinction between the duty owed to invitees and that owed to licensees. *See Antoniewicz v. Reszcynski,* 70 Wis.2d 836, 236 N.W.2d 1 (1975). In Maryland, we have noted that the contemporary usefulness of defining standards of care in terms of the current categories is questionable. As to trespassers, we have made it clear that any change in the law is for the legislature, but we have left the door ajar as to licensees. *See Wagner v. Doehring,* 315 Md. 97, 102 n. 3, 553 A.2d 684 (1989).

depth of six to twelve inches, and that this created an overall illusion that the entire stream was of that depth. They argue that children seven and eight years of age cannot be charged with knowledge that because 200 feet of the stream was frozen and the balance was not, that section was probably deeper. We do not agree that the circumstances here described created an illusion that would remove this body of water from the operation of the open and obvious danger doctrine, or render it an unreasonably dangerous condition.

The presence of the stream was obvious. Its condition in this area had not changed materially during the lifetime of the two children—the excavation having occurred before they were born. The children were old enough to be at large, in the area of their homes where the stream had always been, and they were charged by law with knowledge of the dangers of water, both in its flowing and its frozen form. Whether natural or artificial, streams and ponds will have shallow areas and deep areas, and that fact of life must be anticipated. This was a substantial area of deep water, marked by the presence of gabions along the west bank, and that condition had existed for a long period of time. The presence of ice on this stretch of water signaled some type of change, and carried with it the necessary warning that the depth of the water below could not be determined by ordinary observation. As we have indicated, it is a part of the doctrine of open and obvious danger applicable to bodies of water that knowledge of these perils, including sudden or unexpected depths, is charged to children of sufficient age to be permitted to go abroad without supervision.[9]

---

**9.** *McGarr v. Boy Scouts of America,* 74 Md.App. 127, 536 A.2d 728 (1988), is clearly distinguishable. There, an inexperienced eleven year old scout on his first overnight camping trip was given no instruction and permitted to roam about unsupervised in a wooded area with which the scout leaders were unfamiliar. He was injured when he fell from a precipice that was preceded by a steep slope and that was not readily seen. The parents of the scout had not judged him of

We do not suggest that a body of water can never create an unreasonably dangerous condition requiring some type of action by the landowner or occupier, either to correct the problem or to warn of its presence.[10]  We simply do not find such a condition to have existed here, according to the facts set forth in the complaint.  Moore's Run in this area presented a danger, but it was not a danger so different from that of other bodies of water as to remove it from the applicability of the open and obvious danger doctrine.  As Judge Rosalyn Bell said for the Court of Special Appeals, "[t]here was simply nothing that obscured the fact that Moore's Run, as a matter of law, signaled its own lethal danger." *Casper, supra,* 71 Md.App. at 466, 526 A.2d 87. The defendants' motions were properly granted as to the city.

This holding is likewise dispositive of the claims against the remaining defendants who are before us, who could owe no higher duty to the plaintiffs than we have assumed in the city's case.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.

---

sufficient age and experience to go abroad in that unfamiliar environment, but rather had entrusted his care to others, who, it was contended, were negligent in carrying out that duty.

**10.**  In *Cooper v. City of Reading,* 392 Pa. 452, 140 A.2d 792 (1958), the Supreme Court of Pennsylvania, applying § 339 of the Restatement (Second) of Torts (1966), found that an "unreasonable risk" was created when a pond "innocent in appearance" had a sixteen foot step-off in its center, caused by the force of water entering from a six foot storm drainage outlet pipe.  Two brothers were drowned when they went through the ice near the center of the pond.  The court noted that the cost of correcting the condition was slight when compared to the risk presented;  that the city had notice of a person drowning in the pond three years earlier;  and that the pond itself had no utility.  We express no opinion as to whether we would have reached the same result under those facts, but in any event we do not find *Cooper* persuasive in the context of this case.