64 F.3d 658
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Dorothy MAHON; Jennifer Mahon; Patrick Mahon, Plaintiffs-Appellants,
v.
O.C. SEACRETS, INCORPORATED; Leighton W. Moore, Jr.,
Defendants-Appellees.
 No. 94-1567.
 United States Court of Appeals, Fourth Circuit.
 Argued May 2, 1995.
Decided Aug. 14, 1995.
 
 ARGUED: Clifford Lee Hardwick, HARDWICK & HARRIS, Baltimore, MD, for appellants. Robert Edward Cahill, Jr., NOLAN, PLUMHOFF & WILLIAMS, CHTD., Towson, MD, for appellees. ON BRIEF: Timothy J. Oursler, HARDWICK & HARRIS, Baltimore, MD, for appellants.
 Before ERVIN, Chief Judge, and NIEMEYER and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Dorothy Mahon and her two children, Jennifer and Patrick Mahon, appeal from the district court's grant of summary judgment in favor of defendants O.C. Seacrets, Inc. ("Seacrets") and Leighton Moore, owner of Seacrets. Ms. Mahon filed this wrongful death action after her husband, Ralph Mahon, died from complications arising from injuries sustained in a diving accident on defendants' restaurant property. Finding no genuine issues of material fact as to the questions of primary negligence and contributory negligence, we affirm the district court's award of summary judgment in favor of the defendants.
 
 I.
 
 2
 Ralph and Dorothy Mahon vacationed in Ocean City, Maryland in early August 1990. On Sunday, August 12, the couple spent the day eating and drinking at various local establishments. In the late afternoon, they met an Ocean City businessman named Stewart Adams, who became their companion for the rest of the day. On Adams' suggestion, the three travelled to Seacrets, a restaurant located in the northern section of Ocean City. The Seacrets property lies adjacent to the Isle of Wight Bay, which, along with the Atlantic Ocean, surrounds the barrier island of Ocean City. Because Seacrets was built partially on land that extends out into the bay, the restaurant's designers created a recreation area in which patrons could enjoy the water, while spending time at the establishment eating and drinking.
 
 
 3
 Two sets of facts are relevant at this stage of the proceedings--the first relating to the care taken by the defendants in guarding against injuries to their customers and the second pertaining to Mahon's own conduct leading up to his accident. With respect to the measures taken by the defendants to warn patrons about the dangers of diving into the bay, it is undisputed that nine "NO DIVING" signs were painted on the rails of the upper and lower decks of the property. At oral argument, appellants' counsel conceded that the signs running along the rails of the upper and lower decks depicted in exhibits 5A through 5F had existed on the night of August 12, 1990. Only the "NO DIVING" sign shown in exhibit 21 was allegedly painted after the accident. The most visible of the warnings was a "NO DIVING" sign painted in eight inch high blue letters on the edge of the lower deck, two feet from a ladder that led into the water. The sign measured five feet in length. Although the parties dispute whether Mahon was cognizant of these warnings, others present at the restaurant testified that they were able to see the "NO DIVING" signs despite the darkness of the evening. See, e.g., Joint Appendix, at 366 (medical services employee Bell responding that he could see the sign on the lower deck despite the darkness); id. at 386 (police officer Greegan stating that once his eyes grew acclimated to the darkness after being on the premises for twenty minutes, he had no difficulty seeing the "NO DIVING" sign on the lower deck); id. at 466 (customer Panco stating that, given the lighting conditions that night, she had no difficulty seeing the sign).
 
 
 4
 Nothing about the premises encouraged patrons to dive into the water. There were no diving boards, swings, or signs demarcating certain locations as "deep water" areas. The additions that Seacrets had made to the bay--the setting up of a volleyball net twenty-one feet out into the bay, the availability of floating lounge chairs, the ladder leading into the water--all invited customers into the bay; yet, no specific invitation was made for patrons to enter the water by diving.
 
 
 5
 With respect to Mahon's own actions prior to the accident, most of the facts are undisputed, although the parties disagree as to some of the inferences that can be drawn from those facts. By his wife's own admission, Mahon consumed approximately fifteen twelve-ounce beers between 1:00 p.m. and 10:00 p.m. on August 12, 1990. He drank either seven or eight beers between 1 p.m. and 5 p.m., three more while at the Ocean Club, and then another five while at a restaurant called BJ's South. After arriving at Seacrets between 8:00 p.m. and 8:30 p.m., Mahon had at least one more beer. By the time he reached the hospital ninety minutes after his accident, Mahon's blood alcohol level was .245--nearly two and a half times what constitutes legal intoxication under Maryland law. See Md.Code Ann., Cts. & Jud. Proc. Sec. 10-307(e) (1993) (person considered legally intoxicated with blood alcohol level of .10).
 
 
 6
 The extent to which Mahon's judgment was impaired as a result of his drinking is unclear. Although the appellants point to the testimony of one of the paramedics who stated that Mahon did not appear drunk, the paramedic remarked merely that he did not recall an odor of alcohol and that Mahon was cooperative and not unruly. Other witnesses who testified about Mahon's level of intoxication spoke only about whether Mahon appeared intoxicated. See, e.g., Joint Appendix, at 606 (Mahon's wife stating that her husband did nothing "strange or unusual" while sitting at the table at Seacrets); id. at 631 (patron stating that Mahon's "movements indicated to me he didn't appear drunk"); id. at 640 (patron responding to question of whether Mahon appeared intoxicated by stating: "That's a tough question, mainly because he didn't respond initially, and so there would be no clues from that point. Nothing that he did outwardly without being told by the bystanders, did I, could I go away and say this man was drunk."). While each of these statements suggests that Mahon was not excessively drunk, the remarks do not further suggest that Mahon's judgment was unaffected by his drinking. Nevertheless, at the summary judgment stage we must construe all inferences in the light most favorable to Mahon, the non-moving party, and assume that Mahon was not excessively drunk.
 
 
 7
 Apart from the issue of whether Mahon's extremely high blood alcohol level may have impaired his judgment, Mahon had first-hand experience of the shallowness of the water surrounding the Seacrets' property. Between 8:30 p.m. and 9:30 p.m., despite warnings from Adams that the portion of the bay adjoining the property was too shallow for swimming, Mahon excused himself from the table and walked in a northerly direction towards one of the beach areas abutting the property. Testimony revealed that the beach area was no further than 100 yards from where Mahon's wife and Adams were sitting. Mahon waded in water that came up to his knees. At one point, Mahon sat down in the bay, with water coming up only to his stomach. Mahon never attempted to swim in the water.
 
 
 8
 At 10:00 p.m., when Mahon excused himself from the table for the second time, he walked in a southerly direction down to the lower deck along the western perimeter of the complex. Nothing in the record suggests that Mahon had any reason to believe that the water level by the lower deck would be any deeper than the water level at the beach area. Moreover, no one saw Mahon test the depth of the water prior to diving from the exact spot on the deck where the five foot long "NO DIVING" sign was painted. Although Mahon executed a racing dive in an apparent attempt to skim the surface of the water, his head hit the bottom of the bay and he fractured his neck. Mahon was flown to a nearby hospital where surgery was performed. Four days after the accident, Mahon died of a post-traumatic stroke.
 
 
 9
 Mahon's family filed this diversity action in Maryland district court. Dorothy Mahon and her children are citizens of New Jersey, and defendant Leighton Moore, the owner of Seacrets, is a Maryland citizen. Seacrets, a Maryland corporation with its principal place of business in Maryland, is also a Maryland citizen for diversity purposes. Damages sought in this wrongful death action exceeded $50,000. Consequently, the district court properly exercised its jurisdiction under 28 U.S.C. Sec. 1332. Because the accident occurred in Maryland, our review of the legal issues presented in this diversity case is governed by Maryland law. Ramos v. Southern Maryland Elec. Co-Op., Inc., 996 F.2d 52, 54 (4th Cir.1993).
 
 II.
 
 10
 We review de novo the grant or denial of a motion for summary judgment, applying the same standard as did the district court--whether there exists a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir.), cert. denied, 115 S.Ct. 67 (1994); Ramos, 996 F.2d at 53. "As to materiality, the substantive law will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The materiality issue is critical in this case, because the appellants focus on factual disputes, the resolution of which does not affect the outcome of the suit. As the Supreme Court noted in Anderson, "[f]actual disputes that are irrelevant or unnecessary will not be counted." Id. If, for example, the decedent is found to have been contributorily negligent as a matter of law, based solely on the fact that he did not check the depth of the water prior to diving, then a dispute regarding the effect that alcohol had on his judgment will be considered immaterial.
 
 
 11
 In addition to satisfying Anderson 's materiality requirement, appellants must demonstrate that disputes about material facts are genuine--i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. This translates into a burden to set forth specific facts showing that there is a genuine issue for trial. Id. In attempting to meet this burden, the Mahons, as the non-movants, benefit from having all reasonable inferences drawn in the light most favorable to them. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Shaw, 13 F.3d at 798.
 
 A.
 
 12
 "A cause of action in negligence is made out when the plaintiff proves that the defendant breached a duty owed to the plaintiff, and that the breach of that duty was a proximate cause of damage to the plaintiff." Casper v. Chas. F. Smith & Son, 316 Md. 573, 560 A.2d 1130, 1133 (Md.1989). A defendant's duty to a plaintiff is measured at least in part by the plaintiff's status. In this case, the parties agree that Mahon enjoyed the status of a business invitee, yet the parties differ as to what it was that Mahon was invited to do on the Seacrets' property. As the Casper court observed, it is possible for an invitee's status to change depending on the conduct in which the invitee is engaging. See id. at 1134 n. 7 (citing Glaze v. Benson, 205 Md. 26, 106 A.2d 124 (Md.1954) (although invitation may be implied from environment, and plaintiff was an invitee at a public beach, invitation did not include diving into water from dining pavilion rail)). The defendants' primary argument on appeal, which was accepted by the district court in its memorandum opinion, is that while each of Seacrets' customers had an invitation to enter the water, no one had an invitation to dive from the lower deck, which was clearly marked with "NO DIVING" signs.
 
 
 13
 As the Maryland Court of Appeals noted in Glaze, "[a]n invitation involves the existence of an intent to induce others to act responsively." 106 A.2d at 129. The Mahons contend there is no meaningful distinction between an invitation to swim and play in the bay and an invitation to dive into the water. If nothing else, signs stationed on the upper and lower decks of the property proclaiming "NO DIVING" provide a fair indication that patrons were not being "invited" to dive into the water. Had Seacrets attached diving boards to the lower deck, yet instructed patrons that there would be no diving, then there could be a basis for confusion. Here, however, no inducements created an environment in which reasonable persons would have thought it appropriate to dive into the water.
 
 
 14
 The issue of whether Seacrets invited its patrons to dive into the water is best resolved by closely analyzing Glaze, Maryland's seminal case on this topic. In Glaze, a twenty-year-old man severely injured himself when he dove off the railing of a dining facility that had been constructed on a pier overlooking the water. The man had been at the defendants' resort with his family all day, swimming and diving in a portion of the lake some forty or fifty feet from the dining pavilion. Suing on her son's behalf, the mother claimed that the owner of the pavilion had "failed to warn patrons of hidden perils known to him but unknown to and, in the exercise of due care, undiscoverable by, the appellant, and that by the erection of a misleading sign, in effect, he invited the appellant to dive to disaster as and where he did." Id. at 126. The son had assumed that the water adjacent to the pavilion was as deep as the water in which he had been swimming some forty feet away in an area specifically marked as safe for swimming. After finishing his meal, he left his family and friends at their table, "stepped on a bench and from the bench to the top of the railing, and then dove in, taking a regular, not a flat dive." Id. at 127.
 
 
 15
 The fact that it was less complicated for Mahon to dive into the water from the lower deck of the Seacrets' property than it was for Glaze to balance himself on a railing on the edge of a dining pavilion does not mean that Seacrets encouraged diving anymore than the property owners did in Glaze. It was simply easier to disobey the rules at Seacrets than it was at the Glaze dining pavilion. One of the primary reasons the Glaze court refused to hold the defendants liable was because "[t]here was nothing in its [the pavilion's] arrangement or facilities to suggest that it was to be used in connection with swimming or diving. There were no diving boards, platform or other things to facilitate diving or the entering of the water in any manner...." Id. at 127. Here, while there was the suggestion that swimming and playing in the water were permissible, nothing suggested that diving was an approved means of entering the water. In fact, signs explicitly indicated to the contrary.
 
 
 16
 The most relevant distinction between the present case and Glaze, and one which provides an even stronger case for not holding these defendants liable, is that it was far more difficult for a person wishing to dive off the Glaze pavilion to discover, through the exercise of due care, the hidden perils of the shallow water known to the pavilion owner than it was for Mahon to assess the depth of the water lying one foot below him. Unlike Glaze, in which there existed an "absence of reason to believe that the condition ... [would] be discovered by the patron or the risk realized by him," id. at 127, here, in addition to having painted a "NO DIVING" sign directly on to the lower deck where patrons were able to enter the water, it was reasonable for the defendants to conclude that persons who intended to ignore the "no diving" admonition would at least gauge the depth of the water for themselves before diving. All Mahon had to do was walk a few feet to his left, lower himself into the water via the ladder, and assess for himself the depth of the water. He would have realized very quickly that a person could not dive safely into water that only came up to one's knees.
 
 
 17
 According to the appellants, Seacrets' warnings were insufficient; yet, it is unclear what else Seacrets could have done to insulate itself from liability. At the motion hearing before the district court, appellants' counsel confused Seacrets' duty of reasonable care with a duty to provide every possible safeguard imaginable. Counsel began to brainstorm other things Seacrets might have done to ensure that no one dove off the lower deck:
 
 
 18
 Well, that's hardly anything [everything] they could possibly do. They could have put a little chain across. They could have put a spotlight on the "no diving[sign]." They had electricity out there.... Where was a waiter or a waitress on a busy August night to say, hey, you can't dive there? Why don't they do what some other bars down there do? They have a kid at five bucks an hour who stands there to keep people from getting into these dangerous situations.
 
 
 19
 Joint Appendix, at 758. These suggestions distort Seacrets' responsibility. In hindsight, the placing of a chain along the lower deck might have prevented this particular individual from diving into shallow water, but Seacrets' burden was only to provide safeguards that reasonable persons would have needed to protect themselves from danger.
 
 
 20
 The Mahons' argument is essentially that anytime there is a body of water--regardless of its depth or the purpose for its use--there exists an implied invitation that diving is an appropriate means of entering the water. Here, Seacrets obviously tried to offset that implication by placing "NO DIVING" signs throughout the complex. In addition to relying on the signs, Seacrets had a legitimate expectation in assuming that its customers would act in a reasonable fashion. Nothing about Mahon's actions on the evening of August 12, 1990, was reasonable. As a matter of law, Seacrets is entitled to summary judgment on the issue of primary negligence.
 
 B.
 
 21
 In addition to finding no genuine issues of material fact as to the question of primary negligence, we also conclude that Mahon was contributorily negligent.[1] In order to find contributory negligence as a matter of law, an act or omission of the plaintiff must be one "about which reasonable minds would not differ in declaring it to be negligence." Reiser v. Abramson, 264 Md. 372, 378, 286 A.2d 91, 93 (Md.1972). The question of contributory negligence need only be submitted to a jury when there is conflicting evidence as to material facts relied on to establish contributory negligence. Menish v. Polinger Co., 277 Md. 553, 356 A.2d 233, 238 (Md.1976). When the undisputed facts of the case support a finding of contributory negligence as a matter of law, it is proper for the court to take the issue from the jury and make a ruling on its own. Campbell v. BG & E, 95 Md.App. 86, 619 A.2d 213, 216 (Md.App.1993). In this case, none of the evidentiary conflicts relate to the material fact of Mahon's failure to exercise ordinary care. As a result, this is an issue of law properly resolved by this court.
 
 
 22
 "It is a fundamental principle of negligence law that a person must use his Providence-given senses to avoid an injury to himself." Southern Maryland Elec. Co-Op, Inc. v. Blanchard, 239 Md. 481, 212 A.2d 301, 304-07 (Md.1965). Nothing in the record of this case indicates that Mahon used any of those senses when he chose to dive head first into the water. A business owner is "entitled to rely on the reasonable man standard in evaluating the probabilities of the conduct of patrons." Glaze, 106 A.2d at 128. As a matter of law, there was nothing reasonable about Mahon's actions.
 
 
 23
 Although it is well-settled under Maryland law that business invitees are owed a duty of ordinary care and caution by restaurateurs to see that the business' premises are in such condition as not to imperil customers, it is equally clear that the invitee, himself, has a similar responsibility to exercise ordinary care. Evans v. Hot Shoppes, Inc., 223 Md. 235, 164 A.2d 273, 276 (Md.1960); see also Pfaff v. Yacht Basin Co., 58 Md.App. 348, 473 A.2d 479, 483 (Md.App.1984) ("where it is clear that any person of normal intelligence in his position must have understood the danger, the issue must be decided by the Court"). In Casper, the Maryland Court of Appeals made it clear that duties fall on the shoulders of both business owners and invitees:
 
 
 24
 The duty owed to an invitee by an occupier of land is to use reasonable and ordinary care to keep his premises safe for the invitee and to protect the invitee from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety, will not discover. Casper, 560 A.2d at 1135; see also Harrison, 456 A.2d at 898 (stating that "a plaintiff who fails to observe ordinary care for his own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence"); Menish, 356 A.2d at 236 (holding person guilty of contributory negligence when he fails to use ordinary and reasonable care for his own protection against injury).
 
 
 25
 Mahon did nothing to gauge the depth of the water prior to diving in head first, a fact that is particularly troubling given his experience an hour earlier when he waded in a nearby portion of the bay in water that only came up to his knees. That experience alone should have given Mahon ample warning about the dangers of diving into the water. If, in fact, the water was as murky as appellants claim,[2] there was even more reason for Mahon to investigate the depth of the water prior to diving. Under Maryland law, this lack of care alone demonstrates contributory negligence on the part of Mahon.[3] See also Davis v. United States, 716 F.2d 418, 428-29 (7th Cir.1983) ("[t]o dive from the shore of a lake that has not been marked as safe for diving is negligence per se unless the diver has taken careful soundings of the depth of the lake at the point where he will hit the water").
 
 III.
 
 26
 The tragedy of this case is not lost on this court--a man died, a woman lost her husband, and two children were left without a father. Even when construing the facts in favor of the appellants, however, the events of August 12, 1990, portray a picture of an incredibly reckless act. Those factual disputes that do exist are irrelevant to the ultimate determination of whether Mahon failed to exercise ordinary care and whether Seacrets made a sufficient attempt to assure the safety of its customers. No genuine issues of material fact exist with respect to those questions, and the defendants accordingly are entitled to judgment as a matter of law. The district court's grant of summary judgment in favor of the defendants is therefore
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 The degree to which Mahon was at fault is irrelevant since Maryland is one of a minority of states which has not adopted the comparative fault doctrine. See Harrison v. Montgomery County Bd. of Educ., 295 Md. 442, 456 A.2d 894, 898, 905 (Md.1983) (rejecting call to eliminate contributory negligence scheme in existence since 1847 and to substitute in its place comparative negligence regime). As a Maryland district court noted in E.F. Hutton Mortg. Corp. v. Pappas, 690 F.Supp. 1465 (D.Md.1988), "[u]nder Maryland law, contributory negligence is an all-or-nothing proposition which completely bars recovery of damages by a person whose fault contributes to that damage, no matter how slight that fault may be." Id. at 1475; Ramos, 996 F.2d at 55 (recognizing contributory negligence as an absolute bar to recovery in cases of simple negligence decided under Maryland law). Thus, any negligence on Mahon's part which directly contributed to his death bars recovery in this case regardless of any fault that could possibly be attributed to the defendants. Pappas, 690 F.Supp. at 1476
 
 
 [2]
 We find meritless the appellants' suggestion that the clarity of the bottom of the bay presents a dispute over a genuine issue of material fact. Each of the persons who testified that the water was murky examined the water after the accident. See, e.g., Joint Appendix, at 364 (medical services employee Myron Bell recalling that water was murky after Mahon dove into water and was then pulled out by restaurant workers and patrons); id. at 497 (paramedic Thomas Kane testifying that he could not see the bottom of the bay when he arrived after the accident had occurred). Witness Bell even acknowledged that the bottom of the bay "was sandy and I guess it was stirred up." Id. at 368. Those witnesses who claimed that the bottom of the bay was visible had examined the water prior to the accident. That position is bolstered by the fact that four underwater lights illuminated the water alongside the lower deck. In fact, one of those lights was pointed directly at Mahon as he readied himself for his dive. Nevertheless, we find no basis for concluding that Seacrets' duty to warn turns on the murkiness or clarity of the water
 
 
 [3]
 Because Mahon failed to exercise ordinary care by gauging the depth of the water for himself despite the existence of clearly-marked "NO DIVING" signs, his other mistakes--such as drinking heavily, ignoring the warning of his dinner companion, and disregarding his earlier experience in shallow water on the other side of the Seacrets' property--are not as critical to our evaluation of contributory negligence. For instance, the fact that a blood-alcohol level of .245, measured an hour and a half after the accident, confirms that Mahon had consumed substantial amounts of alcohol prior to the accident. Like the district court, however, we do not find it necessary to determine whether Mahon's consumption of alcoholic beverages contributed to his accident. Even if all inferences are drawn in Mahon's favor, that does not change the fact that he made no attempt to minimize risk to himself by simply testing the depth of the water